Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/06/2024 09:06 AM CDT

**State of Nebraska, appellee, v.
Kolton Barnes, appellant.**

___ N.W.3d ___

Filed September 6, 2024.    No. S-22-587.

1. **Pretrial Procedure: Appeal and Error.** The trial court has broad discretion in granting discovery requests and errs only when it abuses its discretion.
2. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2020), and the trial court's decision will not be reversed absent an abuse of discretion.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
4. **Rules of Evidence: Appeal and Error.** Findings of fact made by a district court pursuant to Neb. Evid. R. 404(3), Neb. Rev. Stat. § 27-404(3) (Reissue 2016), are reviewed by an appellate court for clear error.
5. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
6. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
7. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate

court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

8. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

9. **Constitutional Law: Appeal and Error.** Generally, a constitutional issue not passed upon by the trial court is not appropriate for consideration on appeal.

10. **Evidence: Proof: Words and Phrases.** Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.

11. **Rules of Evidence: Other Acts: Appeal and Error.** An appellate court's analysis under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), generally considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.

12. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

13. **Criminal Law: Appeal and Error.** Harmless error jurisprudence recognizes that not all trial errors entitle a criminal defendant to the reversal of an adverse trial result.

14. **Criminal Law: Trial: Evidence: Appeal and Error.** An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless the error was harmless beyond a reasonable doubt.

15. **Verdicts: Appeal and Error.** The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

16. **Trial: Convictions: Evidence: Appeal and Error.** Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

17. **Evidence.** Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.

18. **Trial: Prosecuting Attorneys: Appeal and Error.** When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.

19. **Trial: Prosecuting Attorneys: Words and Phrases.** Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.

20. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

21. **Trial: Prosecuting Attorneys: Appeal and Error.** If the appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial.

22. **Trial: Prosecuting Attorneys: Due Process.** Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infects the trial that the resulting conviction violates due process.

23. **Constitutional Law: Criminal Law: Due Process: Presumptions: Proof.** Under the Due Process Clause of the 14th Amendment to the U.S. Constitution and under the Nebraska Constitution, in a criminal prosecution, the State must prove every element of an offense beyond a reasonable doubt and may not shift the burden of proof to the defendant by presuming that element upon proof of the other elements of the offense.

24. **Criminal Law: Trial: Evidence: Proof.** Because the burden of proof always remains with the State, it cannot comment on a defendant's failure to produce evidence to refute an element of the crime, because doing so could erroneously lead the jury to believe that the defendant carried the burden of introducing evidence.

25. **Convictions: Evidence: Appeal and Error.** When a defendant is charged in alternative ways with committing an offense, the jury can convict if it finds there is sufficient evidence of either alternative, and thus the judgment of conviction must be affirmed if the evidence is sufficient to support either of the State's alternative theories of guilt.

26. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed.

27. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2)

mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

28. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Saunders County, Christina M. Marroquin, Judge. Affirmed.

Matthew J. McDonald, of Nebraska Commission on Public Advocacy, for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Funke, J.

## INTRODUCTION

Kolton Barnes appeals his convictions in the district court for Saunders County, Nebraska, of first degree murder, intentional cruelty to an animal, two counts of use of a deadly weapon to commit a felony, two counts of negligent child abuse, and evidence tampering. Barnes was sentenced to life imprisonment for the murder conviction and additional consecutive terms of imprisonment for the other convictions. On appeal, Barnes challenges discovery and evidentiary rulings, the sufficiency of the evidence underlying his murder conviction, and his sentences for use of a deadly weapon. Barnes also alleges prosecutorial misconduct and abridgment of his due process rights. Finding no error or abuse of discretion in these matters, we affirm.

## BACKGROUND

### BARNES CHARGED WITH MURDER
### IN FIANCE'S DEATH

The body of Kayla Matulka, Barnes' fiance, was found in a bedroom in the couple's home on July 15, 2020, along with the body of Barnes' dog. Law enforcement officers responding to the scene observed that Matulka was "partially to mostly nude" and had multiple injuries. Officers also observed that the garage and bedroom of the home were in disarray and that there was damage to the garage door and the door leading from the garage into the house.

While officers were at the scene, Barnes came to the house. Barnes spoke with an officer, providing a timeline of his activities over the prior 24 hours. During that conversation, Barnes did not inquire about Matulka, nor when informed of her death, did he ask how she died. The officer found this "surpris[ing]." Barnes then spoke with another officer who observed that Barnes was "[e]motionally distraught . . . kind of in shock." Barnes did not mention to either officer that Matulka came at him with a knife or that she killed the dog, as he later claimed.

Later that day, officers recorded an interview of Barnes. In the interview, Barnes claimed that on the night in question, he returned home to find the doors locked, and that he never entered the house. But Barnes admitted that he deleted text messages he sent to Matulka that night threatening to kick in the door. Also during the interview, Barnes stated that he "wish[ed] [he] could have stopped [himself]" and he wondered "why [he] didn't take [himself], too." In addition, near the end of the interview, while alone in the interview room, Barnes asked for divine forgiveness because "[he] never meant to hurt her."

Barnes was arrested and charged with first degree murder; intentional cruelty to an animal; two counts of use of a deadly weapon to commit a felony; two counts of intentional child abuse, arising from the alleged fact that Barnes left Matulka's

children unsupervised when he departed the house after Matulka's death; and evidence tampering. With the murder charge, the State alleged that Barnes killed Matulka purposely and with deliberate and premeditated malice or in the perpetration of or attempt to perpetrate first degree sexual assault.

Barnes pled not guilty.

## BARNES SEEKS MATULKA'S MEDICAL AND RELATED RECORDS

Before the trial, Barnes sought access to Matulka's mental health, medical, and prescription drug records. Barnes claimed the records were relevant to his defense that Matulka killed herself. At the hearing on Barnes' motion, he pointed to audio and video recordings, depositions, and other evidence showing that Matulka had mental health issues and had previously attempted to kill herself or talked about killing herself. The State resisted the motion, arguing that Barnes "ha[d] a wealth of information already."

The district court granted Barnes' motion. Specifically, the court ordered the State to "secure consent" for the release of Matulka's "pharmaceutical records" and use those records to obtain "mental health and medical records" from the prescribers listed in the pharmaceutical records for review by the court and potential disclosure to the defense under *State v. Trammell*.[1]

Over 7 months later, Barnes' counsel sent prosecutors an email asking if there had been any progress in getting records from Matulka's therapist. The State responded that subpoenas had been served on several persons, including an insurer with a home office in another state, and that all persons except the insurer had responded. The State also indicated that the subpoena was served on the insurer over 4 months earlier, that the insurer had been contacted "no less than six times" to request compliance, and that the insurer had not complied and was not expected to comply.

---

[1] *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989).

Barnes then filed a motion to compel discovery. Specifically, Barnes asked the district court to "provide a court order to the State to compel" the insurer to disclose Matulka's health care providers so her "individual therapy records" could be reviewed by the court for potential disclosure. Barnes acknowledged that the State had previously provided "numerous mental health records and prescription records" to the court and that the court had reviewed those records and provided relevant records to the defense. But Barnes argued that "because there'[d] been so much other information" in the prior records, he believed the records sought would provide further information about Matulka's mental health, "whether the defense is suicide or something else happened in that room that night that she died." The State opposed the motion, claiming that Barnes had "sufficient evidence" of Matulka's mental health issues and that further information would be cumulative. The State also observed that it had previously attempted to obtain the records and that the court might not be able to order the out-of-state insurer to comply.

The district court denied Barnes' motion. In so doing, the court opined that the insurer was not subject to Nebraska jurisdiction. The court also observed that there was "little evidence" that Matulka saw a therapist near the time of her death and no evidence that any therapist would be identified in the insurance records. In addition, the court observed that Barnes had already "received . . . records" and "deposed numerous witnesses" about Matulka's mental health. As such, the court found that Barnes "ha[d] been given ample opportunity in discovery to prepare a defense and that no further efforts to obtain [the] insurance records [were] necessary."

### Pretrial Motions Regarding Admissibility of Evidence That Barnes Threatened to Kill Former Girlfriend

Barnes also filed a pretrial motion to exclude any testimony or evidence about allegations or rumors that he abused,

sexually assaulted, or was controlling of a former girlfriend. Several days later, the State filed notice of its intent to offer evidence under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2020), about Barnes' prior threats to kill this former girlfriend for the purpose of showing Barnes' motive, intent, plan, and modus operandi.

At the hearing on the parties' respective motions, Barnes' former girlfriend testified that he threatened to shoot her on 5 to 10 occasions during the 2 years they dated. The former girlfriend described one occasion when she planned to leave Barnes but ended up staying with him after he pulled out a shotgun and engaged in actions that she viewed as giving her the choice of death or remaining with him. According to the former girlfriend, Barnes "g[o]t . . . violent" when drinking, and she believed "alcohol play[ed] into [Barnes'] behavior" on the occasion she described. But the former girlfriend admitted that Barnes ultimately "left [her] for another woman" and "kicked [her] out" and that she then "came back to live with him a few weeks later."

After the hearing, the district court issued an order allowing the State's rule 404(2) evidence. The court found by clear and convincing evidence that the "domestic altercation" described by the former girlfriend occurred. The court then observed that the relevance of the evidence of the prior threat depended upon whether Barnes used the defense of suicide or sudden quarrel manslaughter at trial. Specifically, the court found that if the defense presents a theory that Matulka committed suicide, the evidence of the prior threat was relevant to establish identity due to the "numerous similarities between the prior bad act [and] the alleged crime." Alternatively, the court found that if the defense contends that Matulka's death was the result of a sudden quarrel, the evidence of the prior threat would assist the jury in determining motive, intent, and plan by showing that "when confronted with his significant other leaving him," Barnes "create[d] a plan involving an ultimatum: a threat of death or staying with him." The district

court also found that the probative value of the prior bad act evidence was not substantially outweighed by the danger of unfair prejudice.

Later, at trial, Barnes again objected to the former girl-friend's testimony under rule 404 and Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). That objection was overruled. But Barnes was granted a limiting instruction stating that the evidence was received only for "purpose[s] of determining . . . identity, modus operandi, motive, intent, and plan with respect to the [pending] charges" and could only be considered for that purpose and not for any other purpose.

## Evidence at Trial

At trial, the State argued that Barnes killed Matulka and the dog after Matulka broke up with him. Barnes, in turn, claimed that he acted in self-defense after Matulka killed the dog and attacked Barnes. The following paragraphs summarize key evidence pertaining to the parties' respective theories of events. Additional evidence and statements from the trial are discussed later in the opinion as they pertain to our analysis of the parties' arguments on appeal.

A friend of Matulka who was with the couple on July 14, 2020, testified that he, Matulka, and Barnes all drank and did drugs during that day. The friend testified that Matulka "wasn't quite herself" and that he could "tell something was wrong." The friend observed Matulka "shrug away" kisses from Barnes, but he also saw "bouts of happiness" when Matulka talked about her and Barnes' upcoming wedding. The friend testified that later in the day, he and Barnes went to a bar while Matulka stayed home. According to the friend, after arriving at the bar, Barnes briefly returned to the house to check on things. At trial, the friend testified that Barnes returned to the house to "see if anybody was there" and that Barnes said it was "not going to be good if anybody's there." But the friend admitted that he previously said Barnes returned to the house to see if the garage door was shut. The

friend testified that Barnes subsequently returned to the bar, but that Barnes was "[o]n his phone the whole time," trying to reach Matulka. The friend testified that Barnes ended up borrowing the friend's cell phone because Matulka "wasn't answering [Barnes'] calls."

In a series of text messages sent on the evening of July 14, 2020, Matulka repeatedly told Barnes that their relationship was over. Barnes replied that Matulka did not really mean this and that he was "disregarding" her statements because she "[couldn't] help it" when she "g[ot] too far into [her] head." Matulka eventually told Barnes that the door to the house was locked and that he needed to find somewhere else to stay. There were further exchanges along similar lines until 11:57 p.m., when Barnes texted Matulka that he would "kick in" the door if it was locked.

Surveillance video from a camera near the couple's house showed that Barnes and Matulka's friend returned to the house around 11:53 p.m. on July 14, 2020. The friend left shortly thereafter, while Barnes opened the garage door and apparently went into the garage. Over the next several hours, Barnes left and returned in his truck, wiped down his truck, and engaged in other activity in the garage. Barnes then left again in his truck around 2:53 a.m. on July 15, and he apparently did not return until after Matulka's body was discovered.

The pathologist who conducted Matulka's autopsy testified that there were 27 puncture or stab wounds on her body, as well as signs of strangulation and blunt force trauma to her head. But the pathologist acknowledged that there was no evidence of entry into or injury to Matulka's vagina, that cuts on Barnes' hand could have been defensive wounds, and that certain of Matulka's injuries could not have been caused "with the same hand" and "at the same time" as other injuries. The necropsy of the dog similarly revealed eight "fairly dramatic" stabbing or sharp force injuries, signs of strangulation, and other injuries.

Barnes testified in his own behalf. According to Barnes, Matulka suffered mental health issues and drug abuse issues and was violent "at times." Barnes testified that Matulka had injured him or other people and damaged their house or other property. Barnes testified that he and Matulka had an argument over sexual relations on the evening of July 12, 2020, that carried over into the following days. Barnes also testified that he viewed Matulka's texts on July 14 ending their relationship as "pretty typical" of her when she was having mental health issues and that he told her they would have sex when he returned from the bar in order to reassure her. Barnes testified that upon returning home, he observed motorcycles knocked over in the garage and the dog lying on the bedroom floor. Barnes testified that Matulka then "c[a]me at [him] with a knife," they "struggled and went to the floor," and when he sat up, she was not moving. Barnes denied raping or trying to rape Matulka, but he said that he did not know if he "caused [her] death." Barnes admitted that he got rid of incriminating evidence, changed his story, lied to officers, and subsequently made inculpatory statements to several people.

A psychiatric pharmacist testified on Barnes' behalf that the drugs in Matulka's system on the night she died and her untreated psychiatric diagnoses "could cause" psychotic and violent behavior. A forensic psychologist testified similarly on Barnes' behalf about Matulka's mental illnesses and how such illness could affect her. The forensic psychologist also opined that based on Matulka's history, she was "capable" of violence toward herself or another person. However, both witnesses admitted that they never evaluated Matulka.

Two of Matulka's former boyfriends also testified on Barnes' behalf that Matulka behaved differently when she was not taking her medications and that she was violent toward them. One boyfriend testified about an occasion when Matulka tried to kill him and herself by driving into or off a bridge. That boyfriend also testified that Matulka kicked, punched,

and screamed at his dogs and that she once "threatened to kill [his] dogs when she had the knife in her hands."

JURY VERDICTS AND SENTENCING

The jury found Barnes guilty as charged, except as to the two counts of intentional child abuse, where it found him guilty of the lesser-included offense of negligent child abuse.

At sentencing, the State argued that Barnes continued to "minimize[] and rationalize[]" his behavior and responsibility by "paint[ing] himself in a good light while painting [Matulka] in a negative light." The State also argued that Barnes failed to display remorse for Matulka's death. Barnes' counsel, in turn, argued that Barnes' criminal history was "very minimal" and consisted of alcohol-related offenses. Barnes' counsel asked that this factor be considered. Barnes' counsel also asked that the sentences for Barnes' two convictions of use of a deadly weapon be at the "lower end of the scale," because whatever happened between Barnes and Matulka "happened very fast." Speaking in his own behalf, Barnes said only that he "underst[ood] it all" and was "not going to waste [the court's] time."

The district court then stated that it had considered the information in the presentence investigation report, "the nature of the defense," and the relevant statutory factors. The court indicated that the "lack of accountability and remorse" it observed during the proceedings and the "violent and brutal" nature of the offenses were "troubling." The court sentenced Barnes to consecutive terms of life imprisonment for first degree murder, 2 to 3 years' imprisonment for cruelty to an animal, 40 to 50 years' imprisonment for each count of use of a deadly weapon, 1 year's imprisonment for each count of negligent child abuse, and 1 to 2 years' imprisonment for tampering with physical evidence.

Because he was sentenced to life imprisonment on the murder conviction, Barnes' appeal was docketed directly in this court as provided by Neb. Rev. Stat. § 24-1106(1) (Cum. Supp. 2022).

## ASSIGNMENTS OF ERROR

Barnes assigns, consolidated, restated, and reordered, that (1) the district court committed prejudicial error in overruling his motion to compel the production of the insurer's records, (2) the district court abused its discretion in allowing evidence that he threatened to kill a former girlfriend, (3) the district court erred in refusing to admit a document regarding demonic possession, (4) the district court committed prejudicial error in admitting a timeline of his and Matulka's activities on their respective cell phones, (5) the State committed prosecutorial misconduct at trial, (6) his due process rights were violated when the State shifted the burden of proof, (7) the evidence was insufficient to find him guilty of first degree murder, and (8) his sentences for use of a deadly weapon were excessive.

## STANDARD OF REVIEW

[1-3] The trial court has broad discretion in granting discovery requests and errs only when it abuses its discretion.[2] It is also within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rule 404(2), and the trial court's decision will not be reversed absent an abuse of discretion.[3] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[4]

[4] Findings of fact made by a district court pursuant to rule 404(3) are reviewed by an appellate court for clear error.[5]

[5,6] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules

---

[2] *State v. Norman*, 282 Neb. 990, 808 N.W.2d 48 (2012).

[3] *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

[4] *Konsul v. Asensio*, 316 Neb. 874, 7 N.W.3d 619 (2024).

[5] *State v. Floyd*, 277 Neb. 502, 763 N.W.2d 91 (2009).

make discretion a factor in determining admissibility.[6] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[7]

[7] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[8]

[8] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[9]

## ANALYSIS

### NO ERROR IN NOT ISSUING ORDER TO COMPEL PRODUCTION OF INSURER'S RECORDS

Barnes' first assignment of error concerns the overruling of his motion for an order to compel an insurer to disclose its records regarding Matulka. Barnes argues that the records sought would have enabled him to identify the therapist who treated Matulka shortly before her death and obtain "individual therapy records" that "could impact if she had a condition which would lead her to killing [the] dog . . . or if she was

---

[6] *State v. Elias*, 314 Neb. 494, 990 N.W.2d 905 (2023).

[7] *Id*.

[8] *State v. Tvrdy*, 315 Neb. 756, 1 N.W.3d 479 (2024).

[9] *Id*.

homicidal."[10] Barnes claims that the absence of these records prejudiced his trial preparation, his production of relevant evidence, and his ability to have his expert testify and also violated his constitutional rights to due process, to a fair trial, and to present a defense. The State counters that the district court reasonably denied Barnes' request and that his constitutional arguments are not properly before this court on appeal.

Under the standard of review previously noted, the district court cannot be said to have abused its discretion in overruling Barnes' motion for an order compelling the production of the insurer's records. The district court based its ruling in part on the fact that Barnes had already "received . . . records" and "deposed numerous witnesses" regarding Matulka's mental health and, as such, "ha[d] been given ample opportunity in discovery to prepare a defense." We agree.

By the time of the hearing on Barnes' motion for access to Matulka's mental health, medical, and prescription drug records, Barnes already had audio and video recordings, depositions, and other evidence showing that Matulka had mental health issues and had previously attempted to kill herself or talked about killing herself.

The district court granted Barnes' motion for access to the records, and Barnes thereafter received further information. As Barnes himself acknowledged in his motion to compel, the State had already provided "numerous mental health records and prescription records" to the court, and the court had reviewed those records and provided relevant records to the defense. Barnes himself recognized at the hearing on his motion to compel that "there'[d] been so much other information in the prior mental health records."

The district court denied Barnes' motion to compel, prompting the present assignment of error. But Barnes nonetheless was able to present extensive evidence at trial of Matulka's mental health diagnoses, symptoms of undiagnosed disorders,

---

[10] Brief for appellant at 28.

history of suicidal ideations, and prior violence toward persons or property. Among the evidence was evidence that the drugs in Matulka's system at the time of her death and her untreated psychiatric diagnoses "could cause" psychotic and violent behavior; that Matulka had at times been violent toward Barnes and two former boyfriends; and that Matulka kicked, punched, and screamed at a former boyfriend's dogs and once "threatened" to kill his dogs while holding a knife.

[9] As to Barnes' constitutional arguments, we agree with the State that those arguments are not properly before us on appeal. Barnes did not raise his constitutional arguments before the trial court, and we thus decline to reach them here. Generally, a constitutional issue not passed upon by the trial court is not appropriate for consideration on appeal.[11]

### No Abuse of Discretion in Admission of Evidence About Barnes' Threat to Kill Former Girlfriend

Barnes' second assignment of error concerns the admission of evidence of a prior threat to kill a former girlfriend if she left him. Barnes argues that the district court erred in finding that the State proved by clear and convincing evidence that the prior threat occurred. Barnes also argues that the district court erred in concluding that the prior threat was relevant to prove identity, modus operandi, plan, intent, or motive. The State counters that the district court reasonably determined that the evidence was admissible after applying the relevant legal framework.

Rule 404 prescribes when evidence of a person's character or a trait of character is admissible. Specifically, rule 404(2) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith," but "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or

---

[11] *Lindner v. Kindig*, 285 Neb. 386, 826 N.W.2d 868 (2013).

absence of mistake or accident."[12] However, rule 404(3) further provides that before the prosecution can offer evidence of a criminal defendant's extrinsic acts under rule 404(2), the prosecution must first prove to the trial court, by clear and convincing evidence and outside the jury's presence, that the defendant committed the act.[13] Barnes' arguments here concern both whether the State made the requisite initial showing under rule 404(3) that he committed the act and whether the evidence of his prior threat was admissible under rule 404(2) for some purpose other than to show that he acted in conformity therewith.

We begin with the first of these arguments regarding rule 404(3) and whether there was sufficient evidence that the prior threat occurred. Barnes does not dispute that his former girlfriend testified at the pretrial hearing about the prior threat. Instead, Barnes essentially argues that the former girlfriend's testimony should not have been credited. Barnes bases this argument on the former girlfriend's admission that Barnes ultimately "left [her] for another woman" and "kicked [her] out" and that she then "came back to live with him a few weeks later." Barnes also points to the former girlfriend's admission that she still had pictures of herself and Barnes on her social media sites and that one of those pictures, captioned as "'[her] favorite,'" was taken several months after "'she claimed [Barnes] had been abusing her.'"[14]

[10] However, there was also testimony and other evidence at the pretrial hearing about why the former girlfriend returned to live with Barnes after he "kicked [her] out" and why she was smiling in the pictures on social media and viewed the picture in question as a "'favorite.'" The district court considered the testimony and other evidence and found

---

[12] *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024). See, also, *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017) (rule 404(2)'s list of permissible purposes is not exhaustive).

[13] See, e.g., *Burries, supra* note 12.

[14] Brief for appellant at 32.

the former girlfriend "credible" because of all the details that she recalled regarding the incident. Giving deference to that determination of credibility,[15] we cannot say that the district court clearly erred in finding that the State proved the prior threat by clear and convincing evidence. Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.[16] That quantum of evidence was present here.

[11] We turn next to Barnes' arguments regarding rule 404(2) and the district court's determination that evidence of the prior threat was admissible to show plan, motive, and modus operandi or, alternatively, to show identity. An appellate court's analysis under rule 404(2) generally considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.[17] When we engage in this analysis in the present case, we agree with the State that the district court did not abuse its discretion in admitting evidence of the prior threat.

Most of Barnes' arguments to the contrary center upon the purposes for which the evidence was relevant. Specifically, Barnes argues that evidence of the prior threat was not relevant to prove identity because "[t]here was no issue of who

---

[15] See, e.g., *Tvrdy, supra* note 8 (appellate court does not pass on credibility of witnesses).

[16] *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). See, also, *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023) (clear and convincing evidence is more than preponderance of evidence, but less than proof beyond reasonable doubt).

[17] *Boswell, supra* note 12.

was involved in this case."[18] Barnes similarly argues that the evidence was not relevant to prove modus operandi because there was no evidence that he "always acted this way when a girlfriend threatened to break up with him."[19] Likewise, Barnes argues that the evidence was not relevant to prove plan, intent, or motive because the "facts" of the two incidents were "different."[20] Barnes observes that there "was no allegation he . . . tried to sexually assault [his former girlfriend] or threatened her with a knife" and that his shotgun remained in the bedroom closet during the incident with Matulka.[21] Barnes also observes that the prior threat was made 5 years before the present offense.

Those arguments miss the mark. We have previously pointed to factual differences between the prior bad act and the present offense when finding that evidence of prior bad acts was not relevant to prove identity or to prove modus operandi as means of establishing identity.[22] However, in the present case, the district court found that the evidence of the prior threat was relevant to identity only if Barnes raised a defense of suicide at trial.[23] Otherwise, the district court found that the prior bad act was relevant to motive, intent, and plan, if Barnes raised a defense of sudden quarrel manslaughter. Ultimately,

---

[18] Brief for appellant at 33.

[19] *Id*.

[20] *Id*. at 32.

[21] *Id*. at 33.

[22] See, e.g., *State v. Glazebrook*, 282 Neb. 412, 428, 803 N.W.2d 767, 781 (2011) (finding evidence of prior attacks was not relevant to prove identity where there were "substantial dissimilarities" between attacks). But see *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011) (modus operandi is characteristic method employed and is not restricted to establishing identity).

[23] Cf. *Pullens, supra* note 22, 281 Neb. at 853, 800 N.W.2d at 224-25. ("'evidence of suicide creates a genuine issue concerning the identity of the person who pulled the trigger'").

at trial, Barnes relied primarily on the theory that he acted in self-defense after Matulka attacked him.

Given a theory of self-defense, we agree with the district court that evidence of the prior threat was relevant to show "motive, intent, and plan." As we have explained:

> Motive is that which leads or tempts the mind to indulge in a criminal act. And motive, even when not an element of the charged crime, is nevertheless relevant to the State's proof of the intent element of the crime. Motive qualifies as a legitimate noncharacter theory under [rule 404(2)] because although character carries a connotation of an enduring general propensity, a motive is a situationally specific emotion.
>
> Intent is generally defined as "'[t]he state of mind accompanying an act.'"[24]

While motive is not an element of first degree murder, any motive for the charged crime is relevant to the State's proof of the intent element.[25] Specifically, we have found that evidence of prior bad acts was "highly probative" and admissible to the question of whether a defendant charged with first degree murder killed the victim with deliberate and premeditated malice, or whether he developed the intent to kill the victim upon a sudden quarrel.[26] We take a similar view here. At trial, Barnes primarily claimed to have acted in self-defense. Given that claim, the evidence of the prior threat was not offered merely to show he had a propensity to threaten to kill significant others who planned to leave him. Instead, the evidence of the prior threat was offered to show that he did not act only in response to Matulka's aggression, but, rather, he acted deliberately and with premeditation, as discussed below.

The fact that the prior threat was made 5 years ago does not alter this conclusion. As we have previously stated, while

---

[24] *Boswell, supra* note 12, 316 Neb. at 570, 5 N.W.3d at 768.

[25] See, e.g., *Floyd, supra* note 5.

[26] *State v. Esch*, 315 Neb. 482, 505, 997 N.W.2d 569, 586 (2023).

remoteness in time may weaken the value of evidence of prior bad acts, such remoteness does not, in and of itself, necessarily justify the exclusion of that evidence.[27]

We similarly reject Barnes' argument that the evidence of the prior threat was unfairly prejudicial under rule 403.[28] Barnes claims that the evidence was merely "propensity evidence to make [him] look bad" and that it "undoubtedly affected" the jury verdict on the murder charge and the corresponding use of a deadly weapon charge.[29] However, Barnes here points to nothing more than the fact that the evidence was prejudicial to him. As we have stated, the fact that evidence is prejudicial is not enough to require exclusion under rule 403, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is considered unfairly prejudicial under rule 403.[30] We see no such tendency to suggest a decision on an improper basis here.

[12] Moreover, as to Barnes' claim that the evidence of the prior threat "affected" the jury verdict,[31] we observe that Barnes does not dispute that he requested and was granted a limiting instruction at trial. That instruction made clear to the jury that the evidence of the prior threat was received only for "purposes of determining the existence of identity, modus operandi, motive, intent and plan" with respect to the pending charges against Barnes and could not be considered

---

[27] See, e.g., *Pullens, supra* note 22 (evidence that defendant threatened to throw victim off balcony 4 years earlier was relevant); *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990) (evidence that defendant sexually assaulted other young boys 6 to 7 years earlier was relevant).

[28] See, e.g., *Boswell, supra* note 12 (evidence that is admissible under rule 404(2) may nonetheless be excluded under rule 403 if its probative value is substantially outweighed by danger of unfair prejudice).

[29] Brief for appellant at 33.

[30] *Boswell, supra* note 12.

[31] Brief for appellant at 33.

for any other purpose. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[32] Barnes points to no such evidence to the contrary here.

## No Error in Refusing to Admit Document
### Regarding Demonic Possession

Barnes' third assignment of error concerns a document about demonic possession that he sought to introduce at trial. Barnes testified that Matulka thought her daughter "was possessed," and he sought to introduce the document in conjunction with that testimony. Barnes also testified that he recognized Matulka's handwriting on the document. The State objected on the grounds of relevance, hearsay, and foundation. Barnes then explained why he believed the document was admissible. However, the State persisted in its objections, and the district court ultimately sustained the objection on foundation grounds.

On appeal, Barnes argues that the district court abused its discretion in excluding the document because the document was authenticated by witness testimony. Barnes claims that the document shows the "severity of [Matulka's] mental illness" and demonstrates that she was "mentally unstable and capable of killing [his] dog" and "[being] the first aggressor" with Barnes.[33] As such, Barnes argues that the document would have corroborated his theory of events and bolstered his credibility if it had been admitted into evidence. The State, on the other hand, argues that the district court properly found that there was insufficient foundation for the admission of the document. Alternatively, the State argues that any error in excluding the document was harmless.

---

[32] *State v. Fernandez*, 313 Neb. 745, 986 N.W.2d 53 (2023). See, also, *Esch, supra* note 26 (it cannot be said that instructions were disregarded unless it affirmatively appears to contrary).

[33] Brief for appellant at 43.

[13-17] We agree with the State that even if the district court abused its discretion in excluding the document, the error was harmless. Harmless error jurisprudence recognizes that not all trial errors entitle a criminal defendant to the reversal of an adverse trial result.[34] An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless the error was harmless beyond a reasonable doubt.[35] The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[36] Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.[37] Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.[38]

Here, Barnes' guilty verdict cannot be seen to have been attributable to the district court's refusal to admit the document regarding demonic possession. The document would not have undermined the abundance of other competent evidence against Barnes to support his murder conviction, as discussed later in the opinion. Moreover, insofar as the document would have provided additional support for Barnes' theory that Matulka's mental health issues made her "capable" of attacking him and killing the dog,[39] plenty of other evidence was admitted on that point. There was extensive testimony about Matulka's mental health issues generally, and Barnes and two of Matulka's former boyfriends testified about her capacity for violence

---

[34] *State v. Anthony*, 316 Neb. 308, 4 N.W.3d 393 (2024).

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Brief for appellant at 43.

specifically. One former boyfriend even testified that Matulka kicked, punched, and screamed at his dogs and that she once "threatened" to kill his dogs while holding a knife. There was also other evidence of Matulka's research on or belief in demonic possession. As such, the document would have been cumulative, and any error in excluding it would have been harmless beyond a reasonable doubt.

## No Error in Admitting Timeline of Barnes' and Matulka's Cell Phone Activities

Barnes' fourth assignment of error also relates to an evidentiary ruling by the district court. At trial, the State offered into evidence a document with a timeline of Barnes' and Matulka's activities on their cell phones on July 14 and 15, 2020. The document was created by an investigator for the prosecution. Barnes stated that he had "[n]o objection" to the exhibit "for demonstrative purposes." However, the State clarified that the exhibit was not demonstrative, but, rather, it was "actual data extracted from a telephone." The district court received the exhibit substantively. Thereafter, during the jury instruction conference, the court asked Barnes if he "want[ed] to put anything on the record" regarding the exhibit. Barnes stated only that "[his] objection was just that it should have been received only for demonstrative purposes and not go back to the [j]ury. And this [was his] objection." The court then reiterated that the exhibit was "considered substantive evidence."

On appeal, Barnes argues that the district court committed prejudicial error in admitting the exhibit as substantive evidence. Barnes contends that because the exhibit "was created by the investigator compiled from other information," it "should have been admitted for demonstrative purposes with a limiting instruction."[40] Barnes also suggests that insofar

---

[40] *Id*. at 44.

as this should have been a demonstrative exhibit and there should have been a limiting instruction, he is entitled to a new trial.[41] The State counters that this assignment of error is not properly before us on appeal because Barnes' objection that the "'[exhibit] should have been received only for demonstrative purposes and not go back to the [j]ury'" was not a valid objection under Neb. Evid. R. 103(1)(a), Neb. Rev. Stat. § 27-103(1)(a) (Reissue 2016).[42] That rule provides that error can be based on a ruling that admits evidence only if the specific ground of objection is apparent either from a timely objection or from the context.[43] The State claims that neither of those conditions was present here. We agree with the State that Barnes has not preserved this issue on appeal.

However, even if Barnes did preserve the alleged error for appeal, he cannot show that the district court committed prejudicial error in admitting the exhibit for substantive purposes. Barnes does not offer any explanation as to how the district court abused its discretion in receiving the exhibit as a substantive exhibit other than to indicate that the document was created by an investigator by compiling data from Barnes' and Matulka's cell phone records.

In *State v. Pangborn*,[44] we discussed what are demonstrative exhibits and what role they play in a trial. In doing so, we stated:

---

[41] See *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013) (defendant entitled to new trial where exhibit, which was admitted prior to start of trial and outside presence of jury for demonstrative purposes only, was allowed to be taken into jury room for deliberations without jury having been informed that exhibit was admitted for demonstrative purposes or having been given limiting instruction specific to exhibit, and court could not say that jury's guilty verdicts were surely unattributable to this circumstance).

[42] Brief for appellee at 33.

[43] See, e.g., *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014).

[44] *Pangborn, supra* note 41.

Demonstrative exhibits are broadly defined as aids "offered to illustrate or explain the testimony of witnesses, including experts, or to present a summary or chronology of complex or voluminous documents." Our case law specifically defines demonstrative exhibits as those that "clarify some issue in the case." As these definitions highlight, demonstrative exhibits are defined by the purpose for which they are offered at trial—to aid or assist the jury in understanding the evidence or issues in a case. "They are relevant . . . only because of the assistance they give to the trier in understanding other real, testimonial and documentary evidence." Thus, even though demonstrative exhibits may be "admitted" into evidence during the course of the trial, they serve a purpose distinct from other exhibits admitted for substantive and not merely demonstrative purposes. [45]

Here, the record indicates that the investigator testified that the exhibit was a timeline of activities on Barnes' and Matulka's cell phones, that he used a software program to retrieve the information, that the information was placed on a spreadsheet using the software program, that he was trained to use the software program, and that he had experience using the software program. The investigator then testified about specific entries on the exhibit. On the other hand, the exhibit was a synthesis of information taken from other lengthy exhibits that were properly received into evidence without objection. Furthermore, because the exhibit contained facts already received into evidence, it was cumulative. As previously mentioned, the erroneous admission of evidence is not reversible error if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding of the trier of fact. [46] As such, we need not determine whether it was

[45] *Id*. at 370, 836 N.W.2d at 797-98.

[46] See *Anthony, supra* note 34.

error to admit the exhibit as a substantive evidence and this argument is without merit.

## No Prosecutorial Misconduct

Barnes' fifth assignment of error concerns alleged prosecutorial misconduct during the trial. Barnes points to four statements by prosecutors that he claims constituted misconduct or that prejudiced his right to a fair trial. The State counters that two of the statements were not misconduct, that Barnes waived his right to assert prejudicial error on appeal as to the third statement, and that the fourth statement did not "rise to the level of plain error," even assuming that it was misconduct.[47]

[18-20] Before turning to specific statements in question and the merits of the parties' arguments concerning those statements, we briefly review the well-established framework applicable to claims of prosecutorial misconduct. When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.[48] As we have stated, prosecutorial misconduct cannot be neatly defined, but generally encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.[49] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[50]

[21,22] Then, if the appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial.[51] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infects the trial that the

---

[47] Brief for appellee at 29.

[48] *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023).

[49] *Id.*

[50] *Id.*

[51] *Id.*

resulting conviction violates due process.[52] Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.[53] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.[54]

As an initial matter, we observe that Barnes did not move for a mistrial based on any of the four statements. We have recently discussed the implications of such failure to move for a mistrial in light of our case law, ultimately concluding that "we have actually treated a defendant's failure to move for a mistrial on the basis of alleged prosecutorial misconduct more like a forfeiture by conducting a plain error review in such circumstances."[55] Consistent with that language, we review the four statements here for plain error insofar as plain error review is otherwise warranted.

In one of the statements allegedly constituting prosecutorial misconduct, the prosecutor asked the jail director for the Saunders County sheriff's office if the director "kn[e]w inmate — or I'm sorry, Mr. Kolton Barnes." Barnes concedes that he did not object to this statement at trial and that, as such, our review is limited to plain error insofar as he did not forfeit his right to allege error on appeal by failing to move for a mistrial. We find no plain error here. Barnes does not point to any legal duty or ethical standard that the

---

[52] *Id.*

[53] *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

[54] *Id.*

[55] *State v. Gleaton*, 316 Neb. 114, 134, 3 N.W.3d 334, 349 (2024).

prosecutor allegedly violated with this statement.[56] Instead, Barnes merely argues that the statement "could have only been said to prejudice [him]" by making the jury believe he was a "dangerous criminal who needs to be kept in jail."[57] However, a statement is not prosecutorial misconduct merely because it is prejudicial; it must also be improper.

Another statement that Barnes alleges constituted prosecutorial misconduct was the prosecutor's statement in closing arguments that she did not "think [one of Matulka's former boyfriends] ha[d] much credibility." Barnes again did not object to the statement at trial and, as such, acknowledges that our review is limited to plain error insofar as he did not forfeit his right to allege error on appeal by failing to move for a mistrial. However, Barnes maintains that there was plain error here because the prosecutor's expression of personal opinion regarding a "key witness for the defense" "may have swayed the jury because [the prosecutor] represented the State."[58] The State counters that the statement was not misconduct, but instead was permissible under *State v. Gonzales*.[59]

The defendant in *Gonzales* alleged prosecutorial misconduct after the prosecutor stated during closing arguments that the defendant lied during law enforcement interrogations when he denied that he was involved in the murder and called the defense's theory of a different shooter "'make believe.'"[60] We rejected that claim. We acknowledged the defendant's argument that there were legal standards and rules prescribing

---

[56] See, e.g., *People v. Young*, No. F054367, 2009 WL 765684 at *3 (Cal. App. Mar. 25, 2009) (unpublished opinion) (finding no prosecutorial misconduct when questioning resulted in witness reading words that described defendant as "'Inmate number 1015'" because those words do not necessarily implicate defendant in either prior crime or prior conviction).

[57] Brief for appellant at 35.

[58] *Id*. at 36.

[59] *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016).

[60] *Id*. at 629, 884 N.W.2d at 108.

that "'[t]he prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant'" and that a lawyer shall not in trial "'state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused.'"[61] But we nonetheless found that the prosecutor's statements did not constitute prosecutorial misconduct.[62]

In so doing in *Gonzales*, we explained that "when a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense."[63] We then proceeded to adopt an approach that looks at the "entire context of the language used" to determine whether the prosecutor "was expressing a personal opinion or merely submitting to the jury a conclusion that the prosecutor is arguing can be drawn from the evidence."[64] Applying that approach to the statements at issue in *Gonzales*, we explained that the statements did not call the defendant a "'liar'" and were "not preface[d] . . . in a way that conveyed a personal opinion."[65] Instead, the statements were "in the context of a detailed summation of the evidence," were in response to comments by defense counsel, and "are properly viewed as a commentary on the evidence presented at trial, as opposed to an expression of personal opinion."[66]

We agree with the State that when the statement at issue here is considered in its context, that statement, like the

---

[61] *Id*. at 645, 884 N.W.2d at 117.

[62] *Gonzales, supra* note 59.

[63] *Id*. at 645, 884 N.W.2d at 117.

[64] *Id*. at 647, 884 N.W.2d at 118.

[65] *Id*. at 648-49, 884 N.W.2d at 119.

[66] *Id*. at 649, 884 N.W.2d at 119.

statements in *Gonzales*, did not constitute prosecutorial mis-
conduct. It is true that the prosecutor here stated that she did
not "think [one of Matulka's former boyfriends] ha[d] much
credibility." However, the statement was in response to com-
ments by defense counsel, who claimed that the testimony
of the former boyfriend was "very important" in determining
whether Barnes was telling the truth. Barnes' counsel had also
suggested that the State avoided mentioning the testimony of
this boyfriend, as well as the testimony of Matulka's other
former boyfriend, in the State's closing arguments because
the boyfriends' testimony "show[ed] [Barnes was] telling the
truth." It was after these statements by defense counsel that
the prosecutor, in reply, made the statement regarding the for-
mer boyfriend's credibility that is at issue here. Moreover, the
statement at issue was immediately followed by an example
of the former boyfriend's testimony at trial that, in the State's
view, called into question his credibility.

Yet another statement that Barnes claims constituted pros-
ecutorial misconduct was the prosecutor's question in closing
arguments about why Barnes and his counsel did not interview
a third former boyfriend of Matulka "if [they] thought he had
something important [to say]." Barnes maintains that this
statement was improper, apparently because it shifted the bur-
den of proof to him.[67] Barnes did not object to this statement
at trial and concedes that our review is limited to plain error
insofar as he did not forfeit his right to allege error on appeal
by failing to move for a mistrial.

We find no plain error here. We do not view this statement
as impermissibly shifting the burden of proof to Barnes for

---

[67] See, e.g., *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017)
(because burden of proof always remains with State, it cannot comment
on defendant's failure to produce evidence to refute element of crime,
because doing so could erroneously lead jury to believe defendant carried
burden of introducing evidence). See, also, *State v. Mann*, 302 Neb. 804,
925 N.W.2d 324 (2019).

the reasons set forth later in this opinion. We also do not view the statement as prejudicial because it was an isolated remark invited by defense counsel.[68] In questioning one of the State's witnesses and then again in closing arguments, Barnes' counsel emphasized that Matulka had another boyfriend whom the State failed to interview. Barnes' counsel also opined in closing that it would have been "important to have the last three boyfriends, instead of just two out of three, sit up here and tell you what happened, when we know something happened and we know [Matulka] has these mental health issues." It was in reply to this statement by the defense that the prosecutor made the statement at issue here.

The final statement that Barnes alleges constituted prosecutorial misconduct also involved alleged burden shifting. While questioning a law enforcement officer regarding evidence of dog DNA under Matulka's fingernails, the prosecutor asked whether all the evidence collected in the case was available for testing by the defense. Barnes objected to this statement at trial and was granted a limiting instruction, although he did not move for a mistrial, as was previously noted.

The parties appear to dispute the standard of review that applies to this statement. Barnes seems to suggest that plain error review applies. However, the State argues that plain error cannot be applied because Barnes objected to the statement at trial.[69] We need not resolve this dispute. Barnes was granted a curative instruction, and as we previously stated, absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[70] Barnes points to no such evidence here.

---

[68] See, e.g., *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016).

[69] See, e.g., *State v. Jones*, 293 Neb. 452, 462, 878 N.W.2d 379, 387 (2016) ("[w]here an issue is raised and complained of at trial, it cannot be the basis of a finding of plain error on appeal").

[70] *Fernandez, supra* note 32. See, also, *Esch, supra* note 26.

### Due Process Rights Not Violated by Allegedly Burden-Shifting Statements

In his sixth assignment of error, Barnes argues that two of the statements that allegedly constituted prosecutorial misconduct also violated his due process rights by improperly shifting the State's burden of proof to him. The State counters that this assignment of error is synonymous with Barnes' assignment of error regarding prosecutorial misconduct insofar as prosecutorial misconduct "'prejudices a defendant's right to a fair trial when the misconduct so infects the trial that the resulting conviction violates due process.'"[71] As such, the State stands on its arguments that (1) Barnes forfeited the right to assert error as to either statement, because he did not move for a mistrial based on either statement, and (2) the statement to which Barnes objected at trial cannot be the basis of plain error on appeal. As stated above, we need not resolve those questions, because even if the burden-shifting issue is preserved for full appellate review separate and apart from the question of prosecutorial misconduct, Barnes' due process rights were not violated by the statements in question.

[23,24] Under the Due Process Clause of the 14th Amendment to the U.S. Constitution and under the Nebraska Constitution, in a criminal prosecution, the State must prove every element of an offense beyond a reasonable doubt and may not shift the burden of proof to the defendant by presuming that element upon proof of the other elements of the offense.[72] Because the burden of proof always remains with the State, it cannot comment on a defendant's failure to produce evidence to refute an element of the crime, because doing so could erroneously lead the jury to believe that the defendant carried the burden of introducing evidence.[73]

---

[71] Brief for appellee at 30 (quoting *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021)).

[72] *Mann, supra* note 67.

[73] *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017).

In the present case, the district court found, and the parties appear to agree, that the prosecutor's question about the defense testing the evidence improperly shifted the burden of proof to Barnes. However, even assuming that the burden of proof was shifted, Barnes cannot show that he was deprived of a fair trial in this regard because the district court repeatedly instructed the jury that the State has the burden of proof and that this burden "never shifts." The district court gave instructions to that effect during jury selection, immediately after the statement in question, and at the close of evidence before the jury began its deliberations. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[74] Barnes has not presented any such evidence to the contrary here.

The other allegedly burden-shifting statement came during closing arguments, when the prosecutor asked why Barnes and his counsel did not interview a third former boyfriend of Matulka if they thought the boyfriend had "something important" to say. Barnes argues that the statement was plain error because it essentially excused the State's failure to interview the third former boyfriend and told the jury that the defense had the burden to track down this former boyfriend. We take a different view of the statement, given that self-defense is a statutorily defined affirmative defense in Nebraska.[75] The relevant statute does not state who bears the burden of proving the affirmative defense.[76] However, we have previously held that in the absence of a statute placing the burden of proving an affirmative defense on the defendant in a criminal case, the nature of an affirmative defense is such that the defendant has the initial burden of going forward with evidence of

---

[74] *Fernandez, supra* note 32. See, also, *Esch, supra* note 26.

[75] *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020). See Neb. Rev. Stat. § 28-1409 (Reissue 2016).

[76] See § 28-1409.

the defense, and once the defendant has produced sufficient evidence to raise the defense, the issue becomes one which the State must disprove.[77]

Here, the statement by the prosecutor goes to Barnes' initial burden of going forward with evidence of self-defense, and not the State's burden of disproving that defense, as is apparent from its context. The prosecutor's statement came shortly after Barnes made an issue of an investigator's failure to interview the third boyfriend. Specifically, Barnes argued that it would have been

> important to have the last three boyfriends, instead of just two out of three, sit up here and tell you what happened, when we know something happened and we know [Matulka] has these mental health issues, so we would know if she tried to do the same thing to [the third boyfriend], so we would know if she assaulted [the third boyfriend]? So we could determine if she's the first aggressor or if [Barnes] was that day when this happened?

This argument shows that the information that the defense hoped to elicit from the third former boyfriend would have been evidence of self-defense, because it allegedly would have supported Barnes' claim that Matulka attacked him. The evidence was not relevant to disproving Barnes' claim of self-defense. As such, because the State had no burden of proof here, its statement that if the defense believed the third boyfriend had "something important" to say, it could have interviewed him, cannot be seen to have improperly shifted the burden of proof to Barnes.

Moreover, even if the statement were seen to have improperly shifted the State's burden to Barnes, we do not view it as reaching the high threshold of plain error that entitles Barnes

---

[77] *State v. Kipple*, 310 Neb. 654, 968 N.W.2d 613 (2022) (quoting *State v. Grutell*, 305 Neb. 843, 943 N.W.2d 258 (2020)).

to a new trial,[78] for the reasons set forth above in our discussion of Barnes' claim that the statement constituted prosecutorial misconduct.

## Evidence Sufficient to Support
## Murder Conviction

Barnes' seventh assignment of error concerns the sufficiency of the evidence underlying his murder conviction. Barnes argues that the State failed to prove beyond a reasonable doubt that he killed Matulka either with premeditation or in the perpetration of sexual assault. In addition, Barnes argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense after Matulka attacked him with a knife. The State disagrees, arguing that the evidence was sufficient to prove every element of first degree murder beyond a reasonable doubt under either theory of guilt.

[25] When a defendant is charged in alternative ways with committing an offense, as was the case here, the jury can convict if it finds there is sufficient evidence of either alternative, and thus the judgment of conviction must be affirmed if the evidence is sufficient to support either of the State's alternative theories of guilt.[79] Because we agree that when viewed in the light most favorable to the prosecution, the evidence here was sufficient to support the State's theory that Barnes killed Matulka with premeditation, we limit our discussion to the evidence pertinent to that theory, and we do not review the evidence regarding the perpetration of sexual assault cited by the parties.

In discussing this assignment of error on appeal, Barnes does not appear to contest that he killed Matulka. Instead,

---

[78] See, e.g., *Mabior, supra* note 48 (plain error may be found on appeal when error unasserted or uncomplained of at trial, but plainly evident from record, prejudicially affects litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of judicial process).

[79] *State v. Bershon*, 313 Neb. 153, 983 N.W.2d 490 (2023).

Barnes argues that the evidence was insufficient to prove that he "acted with premeditation" in Matulka's death.[80] In support of that argument, Barnes points to the fact that he had "been heavily drinking and using illegal substances" prior to Matulka's death.[81] Barnes also points to the absence of evidence that he "acted any differently at the bar" after receiving Matulka's text messages breaking up with him, as well as his response to those messages and his purchase of "beer [at the bar] to take with him."[82] Barnes claims that these factors "show[] there [was] no evidence of premeditation."[83] Instead, Barnes argues that the evidence "is much more likely [that he] acted in the heat of passion under sudden quarrel manslaughter."[84] Barnes also argues that while he may have been wrong in overestimating the danger that Matulka presented, the State failed to prove beyond a reasonable doubt that his use of deadly force against her was unreasonable.

Barnes' arguments here appear to be premised on a misunderstanding of our case law regarding deliberation and premeditation insofar as they suggest that Barnes must have formed a design to kill Matulka in advance of his encounter with her in the couple's home after returning from the bar. That is not the case. Instead, as we have previously explained, in the homicide context, deliberate means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act.[85] The term "premeditated" similarly means to have formed a design to commit an act before it was done.[86] Notably, no particular length of time for deliberation or premeditation is required,

[80] Brief for appellant at 40.

[81] *Id*.

[82] *Id*.

[83] *Id*.

[84] *Id*. See, also, Neb. Rev. Stat. § 28-305 (Reissue 2016).

[85] *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

[86] *Id.*

provided the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.[87] In other words, the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.[88] The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.[89]

Here, as the State argues, there was evidence that Matulka was stabbed or cut 27 times, was strangled, and suffered blunt force injury to her head; that she was bound and gagged using a sexual restraint system and a ball gag; and that Barnes lied to law enforcement and others and also destroyed and manufactured evidence regarding his involvement in Matulka's killing. There was also evidence that Barnes and Matulka had an argument around 2 a.m. on July 14, 2020, wherein she threatened to find sexual gratification elsewhere; that Matulka sent Barnes multiple text messages on the evening of July 14, stating that their relationship was over; that Barnes responded by telling Matulka that she did not mean this and that they would have sex when he got home; that by one account, Barnes briefly returned home from the bar to "see if anybody was there" and said "it's not going to be good if anybody's there"; that Barnes was "[o]n his phone the whole time" he was in the bar, trying to reach Matulka; that Barnes drove "odd[ly]" on the way home, "[k]ind of whipping around the corners," unlike how he drove earlier in the evening; that Barnes texted Matulka threatening to kick in the door if it was locked, but later deleted those texts; that an exterior door to the house was apparently kicked in; that after Matulka was killed, Barnes texted her, apparently expressing acceptance of the break up; that Barnes similarly called or texted other

---

[87] *Id.*

[88] *Id.*

[89] *Id*.

persons after Matulka was killed, saying only that they had fought and she had locked him out of the house; that Barnes got rid of evidence, including the knife with which he stabbed Matulka; and that Barnes later stated that the dog "could" have died protecting Matulka and that he was "going to have to dirty [Matulka] up" at trial.

We agree with the State that when viewed in the light most favorable to the prosecution, this evidence was sufficient for a rational jury to find that Barnes acted with deliberation and premeditation, and not in self-defense. Insofar as Barnes points to evidence that he claims is inconsistent with a finding of premeditation and deliberation, we observe that the jury heard the evidence and unanimously voted to convict Barnes of first degree murder. It is not our role to resolve any alleged conflicts in the evidence or reweigh the evidence.[90]

We also observe that by statute, intoxication is not a defense to any criminal offense and shall not be taken into consideration in determining the existence of a mental state that is an element of the criminal offense unless the defendant proves, by clear and convincing evidence, that he or she did not (1) know that it was an intoxicating substance when he or she ingested, inhaled, injected, or absorbed the substance causing the intoxication or (2) ingest, inhale, inject, or absorb the intoxicating substance voluntarily.[91] Barnes cites no such evidence here.

## Sentences for Use of Deadly Weapon Not Excessive

Barnes' eighth assignment of error concerns his sentences for his two convictions of use of a deadly weapon to commit a felony. Barnes argues that the district court abused its discretion in sentencing him to terms of 40 to 50 years' imprisonment for each of those convictions. Barnes does not dispute that the sentences were within the statutory limits for

---

[90] See *Tvrdy, supra* note 8.

[91] Neb. Rev. Stat. § 29-122 (Reissue 2016). See, e.g., *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024).

the offenses.[92] Instead, he argues that a sentence of 40 to 50 years' imprisonment for using a knife to kill Matulka was "excessive considering . . . he killed [her] after she told him she was breaking up with him" and he "lost control of his emotions."[93] Barnes similarly argues that a sentence of 40 to 50 years' imprisonment for using a knife to kill the dog was excessive because it was "20 times" longer than the sentence of 2 to 3 years' imprisonment that he received for cruelty to an animal.[94] Barnes also argues that both sentences were excessive considering that he "used a large amount of alcohol and drugs hours prior" to the offenses, that he had a "very minor criminal record," and that he was otherwise sentenced to life imprisonment for murder and additional consecutive terms of imprisonment for other offenses.[95] The State counters that the sentences were "appropriate" given the information before the sentencing court and the "exceptionally serious" nature of the offenses.[96]

[26,27] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, as is the case here, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed.[97] In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the

---

[92] See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022).

[93] Brief for appellant at 46.

[94] *Id*.

[95] *Id.* at 46, 47.

[96] Brief for appellee at 35.

[97] *State v. King*, 316 Neb. 991, 7 N.W.3d 884 (2024).

offense and (8) the amount of violence involved in the commission of the crime.[98]

We agree with the State that Barnes' sentences for use of a deadly weapon to commit a felony are not excessive and do not constitute an abuse of discretion when evaluated under the foregoing framework. At the sentencing hearing, the district court stated that it considered the relevant sentencing factors, including Barnes' criminal history. Barnes acknowledges this fact on appeal, but he nonetheless suggests that the district court's consideration of the relevant factors should have resulted in lesser sentences. Barnes cites the principle that the sentence "should fit the offender and not merely the crime,"[99] with the apparent implication that the sentences here did not fit him, particularly given his limited criminal record.

[28] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[100] Here, the sentencing judge specifically noted Barnes' "lack of accountability and remorse" during the proceedings, the "violent and brutal" nature of the offenses, and the lasting impact Matulka's death will have on her family and, in particular, her children, one of whom discovered her body.

Barnes also points to the principle that a sentence "ought not exceed the minimum period consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant."[101] However, Barnes does not point to any rehabilitative need of his that he claims warrants lesser sentences. Instead, Barnes merely argues that his sentences

---

[98] *Id.*

[99] Brief for appellant at 46 (citing *State v. Harrison*, 255 Neb. 990, 588 N.W.2d 556 (1999)).

[100] *King, supra* note 97.

[101] Brief for appellant at 46 (quoting *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991)).

are "an obstacle to discourage any rehabilitative needs he may have."[102]

## CONCLUSION

There is no merit to Barnes' arguments regarding the district court's discovery and evidentiary rulings, the alleged prosecutorial misconduct and violations of his due process rights, the sufficiency of the evidence underlying his murder conviction, or his sentences for use of a deadly weapon to commit a felony. Accordingly, we affirm Barnes' convictions and sentences.

Affirmed.

───────────────

[102] Brief for appellant at 47.