Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/01/2025 08:06 AM CDT

State of Nebraska, appellee, v.
Sirtommy J. Sutton, appellant.

___ N.W.3d ___

Filed August 1, 2025.    No. S-23-967.

1. **Rules of the Supreme Court: Notice: Appeal and Error.** Whether a party has complied with the notice requirements of Neb. Ct. R. App. P. § 2-109(E) (rev. 2024) is determined de novo upon a review of the record.

2. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on a claim that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

3. **Confessions.** It is a mixed question of law and fact whether a custodial interrogation has occurred.

4. **Right to Counsel: Self-Incrimination.** It is a mixed question of law and fact whether there has been an unambiguous invocation of the right to remain silent or to have counsel.

5. ____: ____. It is a mixed question of law and fact whether invocation of the rights to remain silent or to have counsel have been scrupulously honored.

6. **Constitutional Law: Miranda Rights: Waiver: Appeal and Error.** Whether the *Miranda* warnings that were given were sufficient to form the basis of a knowing and intelligent waiver of the Fifth Amendment is reviewed de novo, but whether the waiver, based on the totality of the circumstances, was voluntary is reviewed for clear error.

7.  **Confessions: Appeal and Error.** A district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless this determination is clearly erroneous.

8.  **Motions to Suppress: Appeal and Error.** In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes the trial court as the trier of fact and takes into consideration that the trial court has observed the witnesses testifying regarding the motion.

9.  **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

10. **Constitutional Law: Rules of the Supreme Court: Statutes: Appeal and Error.** Without strict compliance with Neb. Ct. R. App. P. § 2-109(E) (rev. 2024), an appellate court will not address a constitutional challenge to a statute.

11. ____: ____: ____: ____. The constitutionality of a statute for purposes of article V, § 2, of the Nebraska Constitution and Neb. Ct. R. App. P. § 2-109(E) (rev. 2024) includes both facial and as-applied challenges.

12. ____: ____: ____: ____. Strict compliance with Neb. Ct. R. App. P. § 2-109(E) (rev. 2024) is necessary whenever a litigant challenges the constitutionality of a statute, regardless of how that constitutional challenge may be characterized.

13. **Constitutional Law: Statutes: Legislature: Appeal and Error.** When the appeal challenges the constitutionality of an act explicitly permitted by a statute, it is a case "involving the constitutionality of an act of the Legislature," as described in article V, § 2, of the Nebraska Constitution, because a declaration by an appellate court that the act complained of on appeal is unconstitutional would necessarily render unconstitutional the statute that explicitly authorizes the act.

14. **Constitutional Law: Rules of the Supreme Court: Statutes: Appeal and Error.** A litigant cannot avoid the requirements of Neb. Ct. R. App. P. § 2-109(E) (rev. 2024) and the concurrent requisite scrutiny for invalidating statutory provisions merely by failing to cite to the statute that authorizes the constitutionally challenged act.

15. ____: ____: ____: ____. Whenever an appellate court must determine the constitutionality of a statute in deciding an appeal, the party filing the brief explicitly or implicitly challenging the statute must strictly comply with Neb. Ct. R. App. P. § 2-109(E) (rev. 2024) or else the matter necessarily implicating the statute will not be addressed.

16. **Constitutional Law: Miranda Rights: Self-Incrimination.** To counter the inherent pressures of custodial interrogation, *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use

of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination embodied in the Fifth Amendment.

17. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** Under the *Miranda* rule, a "custodial interrogation" occurs when questioning is initiated by law enforcement after a suspect has been taken into custody or is otherwise deprived of freedom of action in any significant way.

18. \_\_\_\_ : \_\_\_\_ : \_\_\_\_. The term "interrogation" under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), refers not only to express questioning, but also to any words or actions on the part of the police, other than those normally attendant to arrest and custody, which the police should know are reasonably likely to elicit an incriminating response from the suspect.

19. \_\_\_\_ : \_\_\_\_ : \_\_\_\_. An "interrogation" does not include a police officer's course of inquiry related to and responsive to a volunteered remark by the accused.

20. \_\_\_\_ : \_\_\_\_ : \_\_\_\_. An "interrogation" does not include accurate statements made by an officer to an individual in custody concerning the nature of the charges to be brought.

21. **Miranda Rights: Police Officers and Sheriffs.** An objective standard is applied to determine whether there is an interrogation within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

22. **Constitutional Law: Right to Counsel: Self-Incrimination: Police Officers and Sheriffs.** If a suspect invokes a constitutional right to remain silent or to the services of an attorney, the authorities must scrupulously honor the invocation.

23. **Right to Counsel.** Before a suspect in custody can be subjected to further interrogation after requesting an attorney, there must be a showing that the suspect initiated dialogue with the authorities.

24. **Miranda Rights: Waiver.** A valid *Miranda* waiver must be both voluntary in the sense that it was the product of a free and deliberate choice and made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

25. \_\_\_\_ : \_\_\_\_. Whether a knowing and voluntary waiver has been made is determined by looking to the totality of the circumstances.

26. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in

considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed.

27. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

28. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

29. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

Joseph L. Howard, of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

FUNKE, C.J., MILLER-LERMAN, CASSEL, STACY, PAPIK, and FREUDENBERG, JJ.

FREUDENBERG, J.

## INTRODUCTION

The defendant was convicted by a jury of discharging a firearm at an occupied motor vehicle and the use of a firearm to commit that felony. He argues on appeal that the district court erred in finding he knowingly and voluntarily waived his *Miranda* rights and that his statements to law enforcement after he signed a waiver were voluntary. He also argues that the statutory jury selection process systematically excluded racial groups. Lastly, the defendant asserts the court abused its discretion by imposing excessive sentences. We affirm.

## BACKGROUND

Sirtommy J. Sutton was charged by information with (1) first degree murder, a Class IA felony, in violation of Neb. Rev. Stat. 28-303 (Cum. Supp. 2024); (2) discharging a firearm at an inhabited house, occupied building, or occupied motor vehicle, a Class ID felony, in violation of Neb. Rev. Stat. § 28-1212.02 (Reissue 2016); and (3) two counts of use of a firearm to commit a felony, both Class IC felonies, in violation of Neb. Rev. Stat. § 28-1205(1)(a) and (c) (Reissue 2016). Sutton's charges arose out of a shooting that occurred in the early morning hours at Sutton's mother's residence in Omaha, Nebraska. Two vehicles were struck by gunfire in the area; one vehicle's passenger, Jermaine Watkins, was shot and survived, and the other vehicle's driver, Jennifer Hickman, was shot and killed.

## Evidence Presented at Trial

At trial, the State's theory of the case was that the shooting of Hickman's and Watkins' vehicles occurred at the same time. The State alleged that Sutton and others were equipped with multiple firearms in front of Sutton's mother's residence (the Sutton residence) when Sutton discharged a firearm at an occupied motor vehicle. The State contended that, in doing so, Sutton aided and abetted in the first degree murder of Hickman.

The theory of Sutton's defense was that two separate shootings had occurred, with Hickman's death resulting from the first shooting, and Watkins' injuries resulting from the second shooting 20 minutes later. Sutton alleged that he was not involved in the first shooting and that, in the second, he had discharged his firearm at Watkins' vehicle in self-defense.

Law enforcement officers testified they responded to a "ShotSpotter" activation, which had indicated 19 shots had been fired. Approximately 20 minutes before, there had been two other activations in the area.

Upon their arrival in the area, law enforcement officers found a vehicle with its headlights on that had collided with

a fence. The vehicle's driver, Hickman, was unresponsive with a gunshot wound and was later pronounced dead. Law enforcement officers were also notified of a second victim, Watkins, who had arrived at a hospital with gunshot wounds that he sustained near the location where the "ShotSpotter" was activated.

Law enforcement officers established a perimeter around the scene. Sutton and his brother drove up to officers who were positioned near the Sutton residence. Sutton informed them that he had been involved in a shooting at the Sutton residence. Sutton relayed that he was presently armed and had law enforcement remove his gun from his person.

Once he had exited his vehicle, Sutton explained to the officers at the scene that his mother had shot someone in self-defense a day or two before and that someone had threatened to kill her in retaliation. Sutton explained that, shortly before officers arrived on the scene, a vehicle had pulled up and stopped in front of the Sutton residence. Sutton's cousin, who was at the Sutton residence, asked who it was. Sutton ran to the front of the Sutton residence, heard gunshots and saw sparks, took cover, unholstered his gun, and fired about seven or eight shots at the vehicle.

Sutton was eventually transported to a police station and placed in an interview room, where he was ultimately interviewed. During the interview, Sutton reiterated to law enforcement that his mother had shot an individual in self-defense 1 or 2 days before. Sutton stated that in the evening or early morning hours before the shootings, he and his brother visited the Sutton residence to check on his mother because she had received death threats. Sutton brought two handguns, an "AR-15 rifle," and numerous rounds of ammunition to the Sutton residence so his mother could protect herself. He gave his mother two of these firearms and kept the handgun that he carries on his person.

In the interview, Sutton described two separate shooting incidents. He told law enforcement that when he and his

brother were about to leave, he went outside to the front of the Sutton residence. He saw two vehicles driving toward each other on the street, and they stopped as if their occupants were talking to each other. Sutton looked away and then heard three gunshots. When Sutton looked back, he saw one vehicle slowly turning down the street near the location where law enforcement later put a perimeter around the scene. A couple of minutes later, Sutton saw a man walking down the street carrying "things." Sutton believed that the vehicle slowly turning had been shot. Sutton stated he was not involved in this first shooting.

After that first shooting, Sutton's cousin, Sutton's mother's boyfriend, and two others joined him outside at the front of the Sutton residence. Sutton stated that his cousin may have had his AR-15 rifle at that time.

About 20 minutes after the first shooting, Sutton saw a vehicle on the street slow down, turn off its headlights, and stop in front of the Sutton residence. Sutton believed there were two people in the vehicle. He heard someone in the vehicle ask, "Who is that?" Law enforcement reminded Sutton that he had told officers at the scene it was his cousin who asked, "Who is that?" Sutton reiterated that he heard, "Who is that?" come from the vehicle.

After Sutton heard "Who is that?" he heard three gunshots and saw a flash from the vehicle's passenger side windows. Sutton took cover, unholstered his gun, fired seven to eight shots toward the vehicle, and then retreated to the side of the Sutton residence to reload his gun. Sutton knew that some of his bullets had hit the vehicle. After Sutton fired at the vehicle, it quickly drove off. Thereafter, Sutton and his brother left the Sutton residence and found law enforcement to discuss the shooting.

Law enforcement testified at trial that a day or two before Sutton's shooting, Sutton's mother reported she had shot a man in self-defense. Sutton's sister described the incident. She testified she had joined her mother and her brother in

picking up some of her younger sisters from a dance class, which was held at a woman's house. When Sutton's sister and her brother went to the door of the residence, a man opened the door. The man was apparently at the house because he was the father of the woman's child. The man asked, "[W]hat?" and immediately slammed the door in their faces. Sutton's sister and brother knocked on the door again. The man aggressively came back to the door after he had "put [a firearm] in his pants." He physically attacked Sutton's brother. As Sutton's brother was defending himself against the man, Sutton's sister put her younger sisters in the vehicle. Sutton's mother, who witnessed the altercation, then got out of the vehicle and tried to defend her son. When the man grabbed his firearm, Sutton's mother shot the man once, striking him in his abdomen. Sutton's mother, brother, and sisters then drove to the police station.

Sutton's sister testified that about 2 or 3 hours after the man was shot, she and her mother were "tagged" in a "[l]ive video" on social media by the woman who held dance lessons in her house. In the video, the woman made threats and implied that she or others were going to seek revenge for the shooting. Sutton's sister showed the video to Sutton, and they both took the threats seriously.

Law enforcement testified that after interviewing Sutton's mother and the man she had shot, they made no arrests, but their investigation remained open. The man and his family were upset that no arrest had been made, but law enforcement was not concerned about the possibility of any retaliation.

A witness to the shooting on August 1, 2021, testified at trial that she observed four or five men standing in front of a residence in the area before hearing multiple gunshots.

Watkins and his friend testified that before the shooting, Watkins was sitting in the passenger seat of his vehicle and his friend was driving. Watkins told his friend to pull over because his vehicle was in the wrong gear, and his friend stopped the vehicle near the Sutton residence. As Watkins'

friend changed gears, multiple shots were fired at the passenger side of the vehicle, and the friend quickly drove to the hospital with Watkins, who had been shot in the arm and leg.

Law enforcement did not recover any shell casings or other evidence from the street in front of the Sutton residence to indicate that guns had been fired from either Hickman's or Watkins' vehicles. Firearms were not found in either Hickman's or Watkins' vehicles, and Watkins and his friend both testified that they were unarmed at the time of the shooting.

Law enforcement found multiple firearms hidden in the Sutton residence, including an AR-15 rifle. Sutton and his cousin were included as likely contributors to the mixture of DNA present on the rifle. Law enforcement located 28 shell casings of different calibers outside of the Sutton residence—6 of the casings were fired from the gun that law enforcement removed from Sutton, 15 from the AR-15 rifle, and 7 from an unrecovered firearm. The handgun that law enforcement removed from Sutton and the multiple firearms they found in the Sutton residence were all excluded from having fired the three projectiles recovered from or near Hickman's vehicle.

## MOTION TO SUPPRESS

Before trial, Sutton moved to suppress the statements he made to law enforcement in his interview at the police station, asserting that the statements occurred after he had invoked his right to counsel and was coerced by law enforcement into waiving it. Ultimately, the district court denied Sutton's motion to suppress and later overruled his renewed motion at trial.

At the hearing on the motion, law enforcement's body camera video of Sutton's conversation with two nearby officers at the scene was offered and received into evidence. The video showed that after an officer removed Sutton's gun from his person, the officer instructed Sutton to exit his vehicle. Sutton invited the officer to perform a pat-down search of his person. While the officer performed the search, Sutton was leaning with his hands against the passenger side of his

vehicle. Sutton then conversed with the two officers at the scene and his brother, who was still in the vehicle, about the events leading up to the shooting. Sutton's hands remained on the vehicle.

After answering questions from the officers, Sutton mentioned that he was instructed to call law enforcement by a weapons association, which affords its members legal representation for claims of discharging their firearms in self-defense. Sutton then asked if he could move toward the back of his vehicle, which the officers permitted. An officer moved toward the back of the vehicle with Sutton and instructed him where to stand. The other officer accompanied Sutton's brother and moved to the driver's side of the vehicle. While Sutton pulled out his membership card for the weapons association and turned on his phone, he continued to answer questions. Shortly after, Sutton expressed that he wanted to contact an attorney, gesturing with the card. During this time, Sutton was not in handcuffs or officially placed under arrest.

Sutton then called the weapons association. During Sutton's call, the officer accompanying him told Sutton that he should "hold off on the phone call right now" and that he would have the chance to do it later. The officer continued to ask Sutton questions about the shooting, which he answered, but none of those statements are challenged on appeal. Eventually, law enforcement officers handcuffed Sutton, explaining it was per department policy, and advised him that he was being detained for an interview.

Once Sutton had been transported from the scene to the police station, he was placed in an interview room where he remained for a total of about 18 hours. Law enforcement officers did not question Sutton because they believed Sutton had invoked his right to counsel at the scene. Sutton asked to make a phone call, and an officer told him that he could not do so at that time. Later, when the officer confirmed with Sutton that he had asked for an attorney, Sutton responded that the officer at the scene had told him to "call [the attorney] right

after." Sutton was held in the interview room during this time so that law enforcement could determine what, if any, charges were appropriate. Sutton appeared to have slept most of this time and was provided food, water, and bathroom breaks. Meanwhile, law enforcement continued its investigation, processing the crime scene and conducting interviews.

After approximately 15 hours, law enforcement officers informed Sutton he would be arrested for criminal homicide and use of a firearm to commit a felony. Sutton expressed confusion, and an officer explained that law enforcement could not provide any details or ask him any questions because he had requested an attorney.

Sutton then asked the officer what would happen if he were to discuss the case. The officer responded that law enforcement would then know what had happened from Sutton's perspective, but the officer did not know whether the discussion would change the facts of the case.

The officer again explained to Sutton that he was being charged with a felony. Sutton responded that he would talk with law enforcement about what happened. When the officer asked for clarification, Sutton reiterated that he was willing to talk about the case.

Sutton asked if he would still go to jail if he talked about the matter, and the officer expressed that, although he would gain Sutton's perspective from the discussion, he could not guarantee that the facts of the case would change. Sutton expressed confusion and asked about the evidence in the case.

The officer explained that if Sutton wanted to discuss the case with him without counsel, the officer needed to understand that Sutton was clear about the choice he was making. The officer also told Sutton that before discussing the case, Sutton needed to be read his *Miranda* rights, understand those rights, and understand that he was changing his decision concerning speaking without counsel.

Sutton again asked if he would still go to jail if he talked to law enforcement. The officer explained that, at that time,

there was enough probable cause to arrest Sutton. Other than gaining Sutton's perspective, the officer did not know what would change because they had not had the conversation. The officer stated that he could not promise Sutton that there would be a different result if he spoke with law enforcement.

The officer offered to retrieve a "*Miranda* form" to read over with Sutton. The officer told Sutton that after reading over the *Miranda* form, Sutton could still decide not to discuss the case without an attorney. The officer asked Sutton whether he wanted more time to think about his decision. Sutton responded that he wanted to talk to law enforcement about the shooting.

After law enforcement returned to the interview room to go over the *Miranda* waiver form with Sutton, they confirmed with him that he had been advised of the charges that they were "ultimately going to book [him] into the corrections for today." Sutton was then advised of his *Miranda* rights. Sutton orally waived his *Miranda* rights and signed a written *Miranda* waiver form.

Law enforcement testified that Sutton was not offered any gifts or inducement to compel him to speak and that Sutton did not express any duress or request counsel during his post-*Miranda* interview.

The district court found that Sutton's statements were not obtained in violation of his rights. It reasoned that when Sutton requested counsel at the crime scene, he was not in custody or subject to interrogation, and that therefore, he did not invoke his right to counsel. Even if Sutton had effectively invoked his right to counsel, law enforcement would not have violated that right because Sutton was not interrogated until after he "indicated that he wanted to talk," was informed of his *Miranda* rights, and knowingly and voluntarily waived those rights. The court further found that Sutton's statements to law enforcement were voluntary and not the product of coercion. Further details of the district court's findings will be set forth in our analysis.

### Jury Selection

After voir dire was completed and before trial commenced, a hearing was held on an oral motion by Sutton alleging the systematic exclusion of minorities from the jury panel. Sutton, who is African-American, requested that the court strike the panel and "impanel" a new one, because there were no minorities on the jury panel and it was not a fair cross-section of the community, which he alleged violated his right to a jury trial guaranteed by the Constitution of the United States.[1]

The only evidence presented at the hearing was the testimony of the clerk of the district court for Douglas County, who was questioned on the statutory process of selecting and summoning potential jurors.[2] The clerk testified she serves as the jury commissioner for Douglas County and oversees the drawing of potential jurors from the county to comprise jury panels.[3] The clerk explained that, by statute, potential jurors are drawn randomly from a combined list of the county's registered voters and its state identification card and driver's license holders.[4] The clerk stated that the statutorily prescribed procedure does not factor in any demographic information of potential jurors.

Neb. Rev. Stat. § 29-2004(2) (Cum. Supp. 2024) provides: "In all cases, except as may be otherwise expressly provided, the accused shall be tried by a jury drawn, summoned, and impaneled according to provisions of the code of civil procedure . . . ." Under the Jury Selection Act,[5] the jury system is meant to ensure, among other things, that "[a]ll persons selected for jury service are selected at random from a fair

---

[1] See U.S. Const. amend. VI and XIV. See, also, *Taylor v. Louisiana*, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); *Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).

[2] See, generally, Neb. Rev. Stat. §§ 25-1644 to 25-1678 (Cum. Supp. 2024).

[3] See § 25-1647.

[4] See § 25-1654.

[5] § 25-1644.

cross section of the population of the area served by the court" and "[n]o citizen is excluded from jury service in this state as a result of discrimination based upon race, color, religion, sex, national origin, or economic status."[6] Section 25-1649 requires that "the lists of grand and petit jurors shall be made up and jurors selected for jury duty in the manner prescribed in the Jury Selection Act." The act defines "[j]ury list" as a list or lists of names of potential jurors drawn from the master key list for possible service on grand and petit juries, the "[j]ury management system" as "an electronic process in which individuals are randomly selected to serve as grand or petit jurors," the "[m]aster key list" as "the list of names selected using the key number pursuant to section 25-1654," and the "[c]ombined list" as "the list created pursuant to section 25-1654 by merging the lists of names from the Department of Motor Vehicles and from election records into one list."[7] Section 25-1654 provides:

(1) Each December, the Department of Motor Vehicles shall make available to each jury commissioner a list . . . containing the names, dates of birth, addresses, and motor vehicle operator license numbers or state identification card numbers of all licensed motor vehicle operators and state identification card holders nineteen years of age or older in the county. . . .

(2) When required pursuant to subsection (3) of this section or when otherwise necessary or as directed by the judge or judges, the jury commissioner shall create a combined list by merging the separate lists described in subsection (1) of this section and reducing any duplication to the best of his or her ability.

(3) In counties having a population of seven thousand inhabitants or more, the jury commissioner shall produce a combined list at least once each calendar year. . . .

---

[6] § 25-1645.

[7] § 25-1646.

(4) The jury commissioner shall then create a master key list by selecting from the combined list the name of the person whose numerical order on such list corresponds with the key number and each successive tenth name thereafter. The jury commissioner shall certify that the master key list has been made in accordance with the Jury Selection Act.

Under § 25-1655, the jury commissioner may use a manual jury selection process or a jury management system to draw names of potential jurors from the master key list.

The clerk conceded it was theoretically possible to have a different system that used census data to determine demographic information of potential jurors within individual Zone Improvement Plan (ZIP) Codes to account for the higher density of particular racial demographics in particular areas of the county. The clerk believed the racial demographics of particular ZIP Codes in Douglas County varied in densities, but she was "uncomfortable making such an assertion without actually looking at the data." The clerk also conceded other factors that could possibly be responsible for racial underrepresentation, including poverty, voter registration, driver's license issuance, and felony convictions.

The clerk reiterated that the combined list from which potential jurors are selected under the statutory scheme does not capture their demographics. She did not utilize location data to select potential jurors because doing so is not prescribed by statute. Instead, they use a software-generated "randomizer process" to pull people from the lists. The clerk testified that no steps are undertaken by the clerk or any staff to "highlight, minimize, or pull out people based on how they look." Because the lists involved "have zero demographic data," there was no information about a person's race.

Sutton argued to the court that although "[t]here's nothing affirmative . . . that's happening in terms of making" the venire an "underrepresentation" of the diversity of the population,

under "the statute and the way that it's implemented here," there is a system in place that is "indifferent to the fact that there are densely populated diverse communities." This, argued Sutton, "creates a result where there's predominantly white juries, that is systemic." The statutory system "creates venires that are not fair cross sections of the community because the location data is not taken into account with respect to densely populated diverse communities."

The court denied Sutton's motion challenging the jury panel. The court reasoned that there was no showing the alleged underrepresentation of the jury panel was due to systematic exclusion in the selection process of potential jurors, and the clerk "clearly established that there was not . . . anything done by the clerk's office to get an improper racial composition."

## Verdicts and Sentencing

Following trial, the jury acquitted Sutton of first degree murder and a related count of use of a firearm to commit a felony. However, the jury returned guilty verdicts for discharging a firearm at an occupied motor vehicle and the related count of use of a firearm to commit a felony, thereby implicitly rejecting his self-defense claim. The district court accepted the jury's verdicts and ordered that a presentence investigation be completed.

At Sutton's sentencing hearing, the district court heard counsel's arguments and Sutton was granted allocution. In pronouncing Sutton's sentences, the court stated it had considered, among other things, the information in the completed presentence investigation report, the trial evidence, and the relevant sentencing factors. The court stated:

> In order to determine an appropriate sentence, I have to take all of these things into consideration. It's not just based on the facts of this case. It's not just based on a lack of a record. It's everything in a combination. . . . [T]here's a very wide range here. As you know, . . . some

of these factors are aggravating, and some are mitigating,
so it's kind of a balance to see what is appropriate.

The court sentenced Sutton to consecutive terms of imprison-
ment of 10 to 14 years for discharging a firearm at an occu-
pied motor vehicle and 5 to 10 years for the related use of a
firearm conviction.

## ASSIGNMENTS OF ERROR

Sutton assigns, restated, that the district court erred (1) in
admitting his custodial interrogation statements in violation
of the Fifth Amendment, (2) in finding that the racial com-
position of the jury pool was not the result of the systematic
exclusion or purposeful discrimination of underrepresented
racial minorities, and (3) in abusing its discretion by imposing
excessive sentences.

## STANDARD OF REVIEW

[1] Whether a party has complied with the notice require-
ments of Neb. Ct. R. App. P. § 2-109(E) (rev. 2024) is deter-
mined de novo upon a review of the record.[8]

[2] In reviewing a motion to suppress a statement based
on a claim that law enforcement procured it by violating the
safeguards established by the U.S. Supreme Court in *Miranda
v. Arizona*,[9] an appellate court applies a two-part standard of
review.[10] Regarding historical facts, an appellate court reviews
the trial court's findings for clear error.[11] Whether those facts
meet constitutional standards, however, is a question of law,

---

[8] *State v. Catlin*, 308 Neb. 294, 953 N.W.2d 563 (2021).

[9] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694
(1966).

[10] See, *State v. Johnson*, 308 Neb. 331, 953 N.W.2d 772 (2021); *State v.
Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009); *State v. Burdette*, 259 Neb.
679, 611 N.W.2d 615 (2000). See, also, *Berghuis v. Thompkins*, 560 U.S.
370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

[11] *Id*.

which an appellate court reviews independently of the trial court's determination.[12]

[3] It is a mixed question of law and fact whether a custodial interrogation has occurred.[13]

[4] It is a mixed question of law and fact whether there has been an unambiguous invocation of the right to remain silent or to have counsel.[14]

[5] It is a mixed question of law and fact whether invocation of the rights to remain silent or to have counsel have been scrupulously honored.[15]

[6] Whether the *Miranda* warnings that were given were sufficient to form the basis of a knowing and intelligent waiver of the Fifth Amendment is reviewed de novo,[16] but whether the waiver, based on the totality of the circumstances, was voluntary is reviewed for clear error.[17]

[7] A district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless this determination is clearly erroneous.[18]

[8] In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes the trial court as the trier of fact and takes into consideration that the trial court has observed the witnesses testifying regarding the motion.[19]

[9] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[20]

---

[12] *Id.*

[13] See *State v. Rogers, supra* note 10.

[14] See *id.*

[15] See *id.*

[16] *State v. Fernando-Granados*, 268 Neb. 290, 682 N.W.2d 266 (2004).

[17] See *State v. Walker*, 272 Neb. 725, 724 N.W.2d 552 (2006).

[18] *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022).

[19] *Id.*

[20] *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024).

## ANALYSIS

### Jury Venire

Sutton assigns and argues that the district court erred in finding that his jury venire's racial composition was not caused by the systematic exclusion or purposeful discrimination of underrepresented racial minorities. Though he does not explicitly challenge any particular statute, Sutton argues it is unconstitutional systematic exclusion for the clerk of the court to continue to use the statutory method of selecting the juror pool when the clerk's office knows African Americans predominantly reside in certain areas and ZIP Codes in Douglas County, that the master list method summons jurors equally from all areas of Douglas County, and that the result of the master list method creates disproportionately higher numbers of white jurors and predominantly white juries. Under the Jury Selection Act, the clerk of the court lacks discretion to select the jury panel differently from the manner prescribed in the act—which is the manner Sutton argues amounts to a systematic exclusion of African Americans from jury pools. Albeit implicitly, Sutton is challenging the constitutionality of the Jury Selection Act.

[10-12] An appellant challenging the constitutionality of a statute must strictly comply with § 2-109(E).[21] Without strict compliance with § 2-109(E), this court will not address a constitutional challenge to a statute.[22] Section 2-109(E) provides in relevant part:

> Cases Involving Constitutional Questions. A party who asserts that a Nebraska statute is unconstitutional under the Nebraska Constitution or the U.S. Constitution must file and serve notice thereof with the Clerk. This notice requirement applies to an appellant, appellee, cross-appellant, or cross-appellee if it is the party asserting that a Nebraska statute is unconstitutional. Such notice

---

[21] *State v. Denton*, 307 Neb. 400, 949 N.W.2d 344 (2020).

[22] *Id*.

> may not be filed until the appeal is docketed. Such notice shall be filed by the party and accepted by the Clerk before the filing of the party's brief.

The constitutionality of a statute for purposes of article V, § 2, of the Nebraska Constitution and § 2-109(E) includes both facial and as-applied challenges.[23] Strict compliance with § 2-109(E) is necessary whenever a litigant challenges the constitutionality of a statute, regardless of how that constitutional challenge may be characterized.[24]

[13-15] Thus, it does not matter if the litigant explicitly or implicitly challenges a statute.[25] When the appeal challenges the constitutionality of an act explicitly permitted by a statute, it is a case "involving the constitutionality of an act of the Legislature," as described in article V, § 2, of the Nebraska Constitution, because a declaration by this court that the act complained of on appeal is unconstitutional would necessarily render unconstitutional the statute that explicitly authorizes the act.[26] A litigant cannot avoid the requirements of § 2-109(E) and the concurrent requisite scrutiny for invalidating statutory provisions merely by failing to cite to the statute that authorizes the constitutionally challenged act.[27] Whenever we must determine the constitutionality of a statute in deciding an appeal, the party filing the brief explicitly or implicitly challenging the statute must strictly comply with § 2-109(E) or else the matter necessarily implicating the statute will not be addressed.[28]

Sutton did not file and serve notice of his Jury Selection Act challenge. Accordingly, we cannot consider Sutton's assignment of error that implicitly challenges its constitutionality.

---

[23] *Smith v. Wedekind*, 302 Neb. 387, 923 N.W.2d 392 (2019).

[24] *State v. Denton, supra* note 21.

[25] See *id.* See, also, e.g., *State v. Catlin, supra* note 8.

[26] See *Smith v. Wedekind, supra* note 23.

[27] *Id*.

[28] *State v. Catlin, supra* note 8.

Motion to Suppress

Next, Sutton argues the district court erred in overruling his motion to suppress his custodial interrogation statements made after he waived his *Miranda* rights, asserting that those statements were elicited in violation of the Fifth Amendment right against self-incrimination. He does not raise in his assignment of error the 6th Amendment right to counsel, Due Process under the 14th Amendment, or violation of any statutory right. Sutton argues the statements were inadmissible under the Fifth Amendment because law enforcement did not scrupulously honor his clear and unambiguous invocation of his right to counsel, in violation of the prophylactic protections of the Fifth Amendment right established by *Miranda* and its progeny. Sutton also argues that, under the totality of the circumstances, his will was overborne by police coercion such that both his waiver of his *Miranda* rights and subsequent statements were involuntary.[29] We find no merit to either argument.

[16] To counter the inherent pressures of custodial interrogation, *Miranda* prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination embodied in the Fifth Amendment.[30] In determining whether statements have been made in violation of *Miranda*, we apply a two-part standard of review.[31] Regarding historical facts, an appellate court reviews the trial court's findings on historical facts for

---

[29] See *Dickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

[30] *State v. Johnson, supra* note 10; *State v. Connelly*, 307 Neb. 495, 949 N.W.2d 519 (2020). See *Miranda v. Arizona, supra* note 9.

[31] See, *State v. Johnson, supra* note 10; *State v. Rogers, supra* note 10; *State v. Burdette, supra* note 10. See, also, *Berghuis v. Thompkins, supra* note 10; *Thompson v. Keohane*, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995).

clear error and whether those facts meet constitutional standards independently of the trial court's determination.[32]

*Miranda* requires law enforcement to give a particular set of warnings to a person in custody before interrogation, including that the suspect has the right to remain silent, that any statement the suspect makes may be used as evidence against him or her, and that the suspect has the right to an attorney, either retained or appointed.[33] These warnings are considered prerequisites to the admissibility of any statement made by a defendant during custodial interrogation.[34]

[17-21] Under the *Miranda* rule, a "custodial interrogation" occurs when questioning is initiated by law enforcement after a suspect has been taken into custody or is otherwise deprived of freedom of action in any significant way.[35] The term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police, other than those normally attendant to arrest and custody, which the police should know are reasonably likely to elicit an incriminating response from the suspect.[36] An "interrogation" does not include a police officer's course of inquiry related to and responsive to a volunteered remark by the accused.[37] An "interrogation" also does not include accurate statements made by an officer to an individual in custody concerning the nature of the charges to be brought.[38] An objective standard is

---

[32] *Id.*

[33] See, *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020); *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019).

[34] *State v. Benson, supra* note 33.

[35] See, *Miranda v. Arizona, supra* note 9; *State v. Vaughn*, 314 Neb. 167, 989 N.W.2d 378 (2023); *State v. Johnson, supra* note 10; *State v. Connelly, supra* note 30.

[36] *State v. Vaughn, supra* note 35; *State v. Johnson, supra* note 10; *State v. Connelly, supra* note 30.

[37] See *State v. Connelly, supra* note 30.

[38] See, *U.S. v. Collins*, 683 F.3d 697 (6th Cir. 2012); *Alvarez v. McNeil*, 346 Fed. Appx. 562 (11th Cir. 2009).

applied to determine whether there is an interrogation within the meaning of *Miranda*.[39]

[22] Only once *Miranda* warnings are given can the suspect voluntarily, knowingly, and intelligently waive these rights.[40] And if a suspect invokes a constitutional right to remain silent or to the services of an attorney, the authorities must scrupulously honor the invocation.[41]

[23] Thus, a suspect who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."[42] This rule is "designed to protect an accused in police custody from being badgered by police officers."[43] Before a suspect in custody can be subjected to further interrogation after requesting an attorney, there must be a showing that the "suspect himself initiate[d] dialogue with the authorities."[44]

[24] When a dialogue is initiated and an interrogation follows after the suspect has "expressed his desire to deal with the police only through counsel," "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."[45] A valid *Miranda* waiver must be both "voluntary in the sense that it was the product of a free and deliberate choice and made with a full awareness both of

---

[39] *State v. Johnson, supra* note 10; *State v. Connelly, supra* note 30.

[40] See *Miranda v. Arizona, supra* note 9.

[41] See *State v. Thomas*, 267 Neb. 339, 673 N.W.2d 897 (2004).

[42] *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). See, also, *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983); *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998).

[43] *Oregon v. Bradshaw, supra* note 42, 462 U.S. at 1044.

[44] *Id*. (internal quotation marks omitted).

[45] *Id*. (internal quotation marks omitted).

the nature of the right being abandoned and the consequences of the decision to abandon it."[46] A waiver is voluntary if it is the product of a free and deliberate choice rather than through intimidation, coercion, or deception.[47]

[25] Whether a knowing and voluntary waiver has been made is determined by looking to the totality of the circumstances.[48] Factors to consider include the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his or her will to be easily overborne.[49] These characteristics of the accused include age, education, intelligence, prior contact with authorities, and conduct.[50] Whether the *Miranda* warnings that were given were sufficient to form the basis of a knowing and intelligent waiver of the Fifth Amendment is reviewed de novo,[51] but whether the waiver, based on the totality of the circumstances, was voluntary is reviewed for clear error.[52]

In *Oregon v. Bradshaw*,[53] the U.S. Supreme Court found that the defendant, who had invoked his *Miranda* right to counsel, initiated further conversation with law enforcement and that his waiver of his *Miranda* rights was knowing and voluntary. When the defendant in *Bradshaw* invoked his right to counsel following a *Miranda* advisement, law enforcement immediately terminated the conversation. Sometime later, without having yet been given the opportunity to confer with an attorney and while being transferred to the county jail, the

---

[46] *State v. Walker, supra* note 17, 272 Neb. at 733, 724 N.W.2d at 561 (internal quotation marks omitted).

[47] *State v. Benson, supra* note 33; *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018).

[48] See, *State v. Connelly, supra* note 30; *State v. Benson, supra* note 33.

[49] *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009).

[50] *State v. Walker, supra* note 17.

[51] *State v. Fernando-Granados, supra* note 16.

[52] See *State v. Walker, supra* note 17.

[53] *Oregon v. Bradshaw, supra* note 42.

defendant asked a police officer, "Well, what is going to happen to me now?"[54] The officer responded that the defendant did not have to talk to him, reminding the defendant that he had requested an attorney, and that "I don't want you talking to me unless you so desire . . . since you have requested an attorney, . . . it has to be at your own free will."[55] The defendant said he understood and was willing to do whatever he could to clear up the matter. The following day, he was again advised of his *Miranda* rights and signed a written waiver of those rights, after which he made the statements at issue.

The U.S. Supreme Court explained, "Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship."[56] The Court thereby determined there had been no violation of the "*Edwards* rule" respecting police initiation of a conversation following the invocation of the *Miranda* right to counsel.[57]

The Court said the next inquiry was whether "the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities."[58] Based on the trial court's findings that the police made no threats, promises, or inducements to talk; that the defendant was properly advised of and understood his rights; and that, within a short time after requesting an attorney, he changed his mind without any impropriety on the part of the police, the Court found no error in the trial court's

---

[54] *Id.*, 462 U.S. at 1042 (internal quotation marks omitted).

[55] *Id.*

[56] *Id.*, 462 U.S. at 1045-46.

[57] *Id.*, 462 U.S. at 1046.

[58] *Id.* (internal quotation marks omitted).

finding that the waiver was knowing and voluntary. As a result, the defendant's statements were held to be admissible.

In *State v. Smith*,[59] we similarly held that the defendant's statements made after he reinitiated a conversation with law enforcement following invocation of the *Miranda* right to counsel were admissible. While being detained and after being read his *Miranda* rights, the 19-year-old suspect said he wished to have a lawyer present, after which the officers did not interrogate him. While en route to the county jail, an officer, whom the defendant knew, informed the defendant that if he did not want to make a statement about what happened, she would not ask him about it. They instead made general conversation. When the defendant asked the officer if Nebraska had the death penalty and she confirmed it did, the defendant began to cry. After arriving at the jail and before the defendant was booked and placed in a holding cell, the officer told the defendant she would be around the jail for a while if he wanted to talk. Approximately 10 to 15 minutes later, before any contact with counsel, the defendant informed an officer he wished to speak with the officer he knew. That officer went to the cell and asked what the defendant wanted to talk about. He said he wished to make a statement. The officer read the *Miranda* rights advisory form to the defendant, and the defendant wrote "yes" and initialed that he was willingly waiving the services of an attorney.

We held, first, that the defendant initiated the conversation, evincing a willingness for a generalized discussion about the investigation and not merely a necessary inquiry arising out of the incidents of the custodial relationship. Second, we held that the State had sustained its burden of proving that under the totality of the circumstances, including the background, experience, and conduct of the accused, a valid waiver of the right to counsel was knowingly and intelligently made. Despite the defendant's suffering from post-traumatic stress

---

[59] *State v. Smith*, 242 Neb. 296, 494 N.W.2d 558 (1993).

disorder and being "at least somewhat mentally deficient,"[60] we held that the trial court did not clearly err in its findings that the defendant knowingly and intelligently waived his *Miranda* rights.

The State argues that Sutton anticipatorily invoked his *Miranda* right not to be interrogated without counsel present, because he made the invocation before being subjected to a custodial interrogation. Despite law enforcement's repeated statements to Sutton after he was placed in custody, acknowledging he had invoked his *Miranda* right to counsel, the State argues the prophylactic mandate that an invocation of a *Miranda* right be scrupulously honored therefore did not apply.[61] The district court agreed but, alternatively, found that if Sutton properly invoked his *Miranda* right to counsel, his *Miranda* rights were not violated. We need not decide here whether Sutton's invocation was effective, because we affirm the district court's decision that even if Sutton effectively invoked his *Miranda* right to counsel, he reinitiated the conversation with law enforcement, expressing a willingness to engage in a generalized discussion about the investigation. Furthermore, we hold that the district court did not clearly err in finding that, before making the statements at issue, Sutton knowingly and intelligently waived his *Miranda* rights and that the challenged statements were voluntary.

The record supports the district court's conclusion that law enforcement scrupulously honored Sutton's invocation of the *Miranda* right to counsel by declining to discuss the investigation with him due to his invocation. Immediately before Sutton's initiation of dialogue with the authorities, law enforcement simply informed Sutton of his homicide charge, which is an action normally attendant to arrest and custody

---

[60] *Id.* at 304, 494 N.W.2d at 564.

[61] See, e.g., *Charette v. State*, 980 N.W.2d 310 (Minn. 2022); *State v. Hambly*, 307 Wis. 2d 98, 745 N.W.2d 48 (2008).

and, therefore, outside the scope of interrogation.[62] Instead of ending his response at "Okay," Sutton went on to inquire, unprompted, about his charge and what would happen if he talked with law enforcement. Sutton first expressed his confusion and questioned his charge by stating, "I'm confused. . . . About what?" He then posed a hypothetical question regarding what would happen if he talked with law enforcement, stating, "So, if we was to talk about it . . . ."

Like the defendant's question in *Bradshaw*,[63] "Well, what is going to happen to me now?" Sutton's questions evinced a willingness and desire for a generalized discussion about law enforcement's investigation. Sutton's volunteered remarks indicated he wanted to know why he was charged with homicide and whether talking with law enforcement would impact his charges, which are not merely necessary inquiries arising from his custody. And law enforcement was careful not to interrogate Sutton during their conversation with Sutton before he was advised of and waived his *Miranda* rights. After Sutton initiated the conversation with his first question, law enforcement simply responded to Sutton's numerous inquiries, which were the driving force behind the conversation. Law enforcement only asked a few questions to clarify what Sutton meant with his statements about wanting to talk to law enforcement and to determine whether he wanted to go over the *Miranda* waiver form. These questions also only occurred after Sutton had expressed his desire to talk, and their purpose was to clarify what Sutton was expressing, not to elicit incriminating information from him. Notably, the record does not suggest that law enforcement did or said anything during the pre-*Miranda* conversation that they should have known would be reasonably likely to elicit an incriminating response from Sutton.

---

[62] See, *U.S. v. Collins, supra* note 38; *Alvarez v. McNeil, supra* note 38.

[63] *Oregon v. Bradshaw, supra* note 42, 462 U.S. at 1042 (internal quotation marks omitted).

Neither party disputes that Sutton's subsequent *Miranda* waiver was knowingly made; Sutton was carefully informed of his rights through law enforcement's use of the *Miranda* waiver form. Sutton instead argues that law enforcement coerced him into waiving his rights by detaining him for 15 hours without access to an attorney, not providing him the opportunity to use the phone, giving him only a slice of pizza, holding him in the interview room with the light on and without a bed, and intentionally catching him off guard when informing him that he would be arrested for homicide. Sutton further alleges that law enforcement manipulated him by implying he had only two options: (1) waive his *Miranda* rights, talk to law enforcement without counsel, and potentially avoid arrest, or (2) maintain his invocation, continue to wait in the interview room without counsel, and be arrested for homicide.

Contrary to what Sutton suggests, the record demonstrates that law enforcement did not frame Sutton's options as either (1) waiving his right and possibly avoiding arrest or (2) maintaining his invocation and being arrested for homicide. Instead, law enforcement explained that Sutton could waive his rights and talk without counsel but repeatedly told him that the only thing that would change would be law enforcement's learning Sutton's perspective. Throughout the conversation, law enforcement continuously stressed they were unsure whether Sutton's statements about the incident would impact the facts of the case or whether he would go to jail, because they had not had the conversation with him. Law enforcement informed Sutton that, regardless, they had enough probable cause to arrest him and that his homicide charge was a felony, which he would have to be arrested and "see a judge for." Most notably, after law enforcement returned to the interview room to go over the *Miranda* waiver form with Sutton, they confirmed with him that he had been advised of the charges that they were "ultimately going to book [him] into the corrections for today."

Furthermore, as the district court found in its order denying Sutton's motion to suppress, law enforcement did not make any promises or guarantees to Sutton during their pre-*Miranda* conversation. Law enforcement explicitly stated they could not promise a different result if Sutton talked. Law enforcement did not tell Sutton whether talking would help or hurt him. They even told Sutton that they could not make him any promises because it is "basically illegal." Clearly, law enforcement expressed that Sutton's decision to talk without counsel would not guarantee that he would walk free that day, and they repeatedly advised Sutton that they could not guarantee him an outcome or promise him anything.

The district court did not clearly err in finding that Sutton was not deprived of food or sleep. As the court noted, Sutton appears to have slept during most of the time he was alone in the interview room, and he was provided a slice of pizza, which he never ate. Regarding Sutton's attentiveness, the court did not clearly err in finding that, during the interrogation, Sutton seemed alert, understood what was happening, and did not appear to be impacted by how long he had been in custody. In fact, the court found that Sutton's body language and demeanor during the interrogation seemed very similar to how he had conducted himself at the scene when he approached law enforcement.

Lastly, the court found the length of detention in the interview room did not negate the voluntariness of Sutton's waiver of his *Miranda* rights. We agree. As indicated by cases in other jurisdictions,[64] such a period of time in an interview room is insufficient to render a *Miranda* waiver involuntary on its own. The district court did not clearly err in finding law enforcement had not, as defense counsel suggested, worn Sutton down to compel a waiver.

---

[64] See, *U.S. v. Carpentino*, 948 F.3d 10 (1st Cir. 2020); *People v. Collins*, 106 A.D.3d 1544, 964 N.Y.S.2d 393 (2013); *People v. Hales*, 272 A.D.2d 984, 709 N.Y.S.2d 276 (2000).

We acknowledge that refusing to allow a suspect to contact an attorney is a relevant circumstance in the totality of the circumstances surrounding the voluntariness of a waiver of *Miranda* rights.[65] But it is not decisive and must be weighed in light of all the surrounding circumstances. Law enforcement delayed, but did not refuse, Sutton's apparent requests to contact an attorney. The record does not indicate this was out of any intent to coerce Sutton into making a statement without the presence of counsel, and the district court did not clearly err in finding that Sutton "seemed quite aware of what was happening and understood the situation when he eventually decided to talk," expecting that he could be held for 48 hours while law enforcement investigated the shooting.

Considering Sutton's level of sophistication and experience with law enforcement, his demonstrated awareness of what was happening, the absence of any threats or false promises by law enforcement, law enforcement's offer to give Sutton more time to think about whether he really wanted to waive his *Miranda* rights before proceeding further, and the thoroughness of the *Miranda* advisory and waiver that occurred before any of the statements at issue, the district court did not err in concluding that, in light of all the surrounding circumstances, Sutton's *Miranda* waiver was knowingly and voluntarily made.

Sutton also appears to more broadly challenge the voluntariness of his statements under traditional standards. As explained by the U.S. Supreme Court in *Dickerson v. United States*,[66] "The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry." However, "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the

---

[65] See, e.g., *People v. Leverson*, 2024 IL App (1st) 211083, 256 N.E.3d 1138, 482 Ill. Dec. 174 (2024).

[66] *Dickerson v. United States, supra* note 29, 530 U.S. at 444.

dictates of *Miranda* are rare.'"[67] We agree with the district court that this is not one of those rare cases.

The district court did not err in denying Sutton's motion to suppress and in admitting his custodial interrogation statements at trial.

### Excessive Sentences

Lastly, Sutton argues the district court imposed excessive sentences. Although he does not dispute that his sentences fall within the statutory sentencing limits, he argues that his belief that he was acting in self-defense and his low-risk-level scores warranted lighter sentences. An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[68] We hold that the district court did not abuse its discretion.

[26-28] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed.[69] In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[70] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's

---

[67] *Id.*, quoting *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

[68] *State v. Barnes, supra* note 20.

[69] *Id*.

[70] *Id.*

demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[71]

Sutton was convicted of discharging a firearm at an occupied motor vehicle, a Class ID felony, and use of a firearm to commit a felony, a Class IC felony, for which he received respective imprisonment terms of 10 to 14 years and 5 to 10 years. Statutory sentencing guidelines permit imprisonment for 5 to 50 years for Class IC felonies and for 3 to 50 years for Class ID felonies.[72] Thus, Sutton's sentences are not only within the statutory limits, but they are also on the lower ends of the ranges for permitted imprisonment durations.

In pronouncing Sutton's sentences, the district court stated that it had considered, among other things, the relevant sentencing factors, the evidence from trial, and the information in the presentence investigation report. The court stressed how some of these factors were aggravating and others were mitigating, which affected its analysis of what sentences were appropriate for Sutton. Sutton's alleged belief that he was acting in self-defense was addressed during trial and in the presentence investigation report, which also contained Sutton's "LS/CMI" assessment scores. Although Sutton seemingly requests for us to reweigh the factors he alleges the district court inadequately assessed, it is not this court's function to conduct a de novo review of the record to determine what sentences we would impose.[73]

[29] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[74] When considering the factors that Sutton mentions, as well as the other information surrounding his case,

---

[71] *Id.*; *State v. King*, 316 Neb. 991, 7 N.W.3d 884 (2024).

[72] Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024).

[73] *State v. King, supra* note 71.

[74] *State v. Barnes, supra* note 20.

we cannot find that the district court abused its discretion. We affirm his sentences.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Affirmed.