IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. WILLIAMS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CHRISTOPHER WILLIAMS, APPELLANT.

Filed April 21, 2026.    No. A-25-578.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Allyson A. Mendoza for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

MOORE, PIRTLE, and FREEMAN, Judges.

MOORE, Judge.

### INTRODUCTION

Christopher Williams appeals his conviction of second degree assault entered following a jury trial in the district court for Douglas County. On appeal, he assigns error to the district court's admission of testimony regarding a prior violent act by Williams and overruling Williams' motion for mistrial, as well the sufficiency of the evidence to support his conviction and the sentence imposed by the court. Finding no error, we affirm.

### STATEMENT OF FACTS

On August 7, 2024, Williams was charged by information with second degree assault, a Class IIA felony, and terroristic threats, a Class IIIA felony. The State alleged that on March 29, 2024, Williams strangled his wife, Megan Williams, and that she then fled to the residence of Anthony Maxey. On March 30, Williams allegedly struck Maxey in the head with a hatchet as

- 1 -

Maxey was leaving his residence with Megan. Williams was later charged by a second amended information with second degree assault and tampering with a juror, witness or informant, a Class IV felony. Williams was ultimately acquitted of the witness tampering charge, and, as such, we only discuss the facts necessary to resolve the issues related to the charge of second degree assault.

At a pretrial hearing on May 12, 2025, Williams made an oral motion in limine requesting that the district court exclude evidence regarding any acts of domestic violence perpetrated by Williams on Megan. Williams asserted that admission of Megan's statements regarding the incident on March 29, 2024, was improper character evidence and unduly prejudicial with no probative value.

In an order filed on May 15, 2025, the district court sustained Williams' motion in limine as to any acts of domestic violence allegedly perpetrated by Williams on Megan on any date prior to March 29, 2024. However, the court overruled Williams' motion as to any acts of domestic violence allegedly perpetrated by Williams on Megan on March 29 and 30, 2024, as the court found that such evidence was inextricably intertwined with the charged assault occurring on March 30 and that it was necessary to present a coherent picture of the assault. Williams renewed the objection based on his motion in limine at trial.

A jury trial was held over 4 days in May 2025. The following evidence was adduced.

Megan testified that she is married to Williams and lived with him and her children. On March 29, 2024, Williams' mother contacted her, asking for her to find Williams. Megan found Williams in the parking lot of a fast-food restaurant. In response to a question as to how Megan initially found Williams on March 29, she testified that "either I saw him, or he saw me, and he had made some type of drug deal[.]" Williams objected to this testimony and moved for a mistrial. The district court overruled Williams' motion for a mistrial, sustained his objection to the testimony, struck Megan's testimony, and instructed the jury to disregard Megan's statement.

Megan testified that after she located Williams, they left in her vehicle with Williams driving and Megan as the passenger. While in the vehicle, Williams became "irate," and Megan, in fear, ran from the vehicle when they were stopped at a red light. As Megan ran through a parking lot, Williams followed her in the vehicle. When Williams got to Megan, he strangled her by putting both of his hands around her neck, and she was "seeing black." Megan kicked Williams and began to run, but Williams again followed her in the vehicle. Megan eventually got back into the vehicle at Williams' direction, and they returned home together.

After Williams fell asleep, Megan left and went to Maxey's apartment. Megan and Maxey were previously in a romantic relationship, during which they had three children together. While at Maxey's apartment, Megan reported the assault to the police. Maxey then took Megan to the hospital for treatment of the injuries to her throat.

On March 30, 2024, Maxey and Megan left Maxey's apartment to pick up Megan's medication. Maxey armed himself with a pole on the way out, because he and Megan were concerned about the threat posed by Williams. Once outside, Maxey noticed that a shirt had blown off his balcony and he went to retrieve it. Megan testified that she was standing on the front step of the apartment complex as Maxey walked toward the shirt. Megan felt a gust of wind and when she turned around, she saw a "black puffer jacket and a hatchet in the air." Megan screamed Maxey's name as Maxey was hit in the head with a hatchet. Megan ran toward an area of the apartment complex with garages where a U-Haul truck was parked. The individual in the black

puffer jacket also ran away. After the individual ran past the U-Haul truck, he turned his head. At that point Megan recognized that the individual was Williams.

Maxey testified that after retrieving the shirt that had blown off his balcony, he turned toward Megan and noticed an individual who had an object in his hand. The individual then swung the object, hitting Maxey on his forehead. Maxey recognized the individual as Williams immediately because he was "looking right at him when the hatchet [was] coming down." Maxey noted that he only had a "few seconds to see what's right in front of me." After Maxey was struck, he chased Williams before returning to Megan near the U-Haul truck.

Ulises Gonzalez was in possession of the U-Haul truck at the apartment complex on March 30, 2024. He testified to hearing a woman screaming and running toward the U-Haul. The woman told Gonzalez that someone was trying to hurt her. At the time, Gonzalez also saw a man who was actively bleeding and called 911. Gonzalez testified that an individual in a black puffer jacket had been waiting outside the apartment building for at least 30 minutes prior to the assault. Gonzalez later saw an individual in a black puffer jacket fleeing the scene.

Law enforcement arrived, and Maxey was taken to a hospital by ambulance. At the time, Maxey was bleeding and had suffered a fractured skull. Maxey's treating physician observed a 3-to-4-inch laceration to Maxey's right forehead, which appeared to be consistent with Maxey being hit by a sharp object. The physician testified that "the fact that it went through the skin, the subcutaneous tissue, all the way to the bone, breaking the bone, indicates there was significant force applied." Maxey testified that he had pain when he was struck by the hatchet, and that he continues to have headaches, a scar, and post-traumatic stress disorder.

During their investigation, law enforcement officers were unable to recover a hatchet or a black puffer jacket from Williams.

Following the State's presentation of evidence, Williams made a motion to dismiss, which the district overruled. After deliberating for roughly 2 hours, the jury found Williams guilty of second degree assault and not guilty of witness tampering. The district court accepted the jury's verdicts and ordered a presentence investigation report (PSR).

On July 7, 2025, the district court sentenced Williams to a term of 16 to 20 years' imprisonment. Williams was given credit for 377 days served.

Williams appeals.

## ASSIGNMENTS OF ERROR

Williams assigns that (1) the district court erred in admitting testimony regarding a prior violent act by Williams, (2) the district court abused its discretion in overruling Williams' motion for mistrial, (3) the evidence presented at trial was insufficient to find Williams guilty of assault in the second degree, and (4) the district court abused its discretion by imposing an excessive sentence.

## STANDARD OF REVIEW

Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Ramos*, 319 Neb. 511, 23 N.W.3d 640 (2025). A judicial abuse of discretion

exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id*.

An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the trial court has abused its discretion. *Id*.

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Lewis*, 319 Neb. 847, 25 N.W.3d 421 (2025).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Sutton,* 319 Neb. 581, 24 N.W.3d 43 (2025).

ANALYSIS

ADMISSIBILITY OF EVIDENCE

Under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. See *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023). However, rule 404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. *Id*.

Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime and evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts. Evidence of other crimes or bad acts is also inextricably intertwined with the charged crime if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime. *Id*.

For example, in *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016), the Nebraska Supreme Court affirmed the defendant's convictions after finding that evidence of his prior threat against one of the victims was inextricably intertwined with the charged crimes. The defendant argued that the evidence should have been excluded under rule 404(2). The Supreme Court disagreed, concluding that evidence of the prior threat was "necessary to present a coherent picture of the shooting"; without that evidence, it would have appeared to the jury that the defendant randomly shot the victims. *State v. Parnell*, 294 Neb. at 575, 883 N.W.2d at 670.

Similarly, in *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017), the Nebraska Supreme Court rejected the defendant's argument that the district court erred in allowing the admission of evidence of his prior assault on the victim under rule 404(2) and as part of the res gestae of the crime. In doing so, the Supreme Court observed that while the district court found that the evidence of the prior assault was admissible under rule 404(2), the court did not need to consider that ruling, because the "assault evidence was inextricably intertwined and not 404 evidence." *State v. Burries*, 297 Neb. at 406, 900 N.W.2d at 513. The court based that conclusion on the fact that the assault was "part of the factual setting" of the subsequent murder, and the record

supported the district court's conclusion that "evidence of the assault was necessary to present a coherent picture of the murder." *Id*. at 405, 900 N.W.2d at 513.

Here, as in *Parnell* and *Burries*, the evidence of Williams' assault of Megan on March 29 was not used to establish that Williams had a propensity for violence. Instead, the evidence was used to explain why Megan went to Maxey's apartment, why Megan and Maxey were together on March 30, and why Williams assaulted Maxey outside the apartment that day.

Evidence of Williams' prior assault was also relevant and not unfairly prejudicial. To be relevant, evidence must be probative and material. Evidence is probative if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence. A fact is material if it is of consequence to the determination of the case. *State v. Mabior, supra*. Here, the evidence was relevant for the reasons previously discussed to present a coherent picture of the assault on Maxey.

The same is true as to Williams' claim that evidence of the prior assault was unfairly prejudicial to him. The fact that evidence is prejudicial is not enough to require exclusion under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial under rule 403. See *State v. Mabior, supra*. That is not the case here.

Accordingly, we find that the district court did not abuse its discretion when it admitted evidence regarding Williams' prior assault of Megan.

MOTION FOR MISTRIAL

Williams next assigns that the district court abused its discretion in overruling Williams' motion for a mistrial when Megan testified that Williams was involved in a drug deal because its damaging effect was such that it could not be removed by proper instruction to the jury and prevented Williams from a fair trial.

A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Lenhart*, 317 Neb. 787, 11 N.W.3d 661 (2024). To prove error predicated on the failure to grant a mistrial, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id*.

Specific to the type of prejudice at issue here, Nebraska appellate courts have held that, without more, the simple fact that a jury heard an improper statement is not enough to produce the requisite prejudice. See, *id*; *State v. Esch*, 315 Neb. 482, 997 N.W.2d 569 (2023). Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material. *State v. Lenhart, supra*. It is presumed that a jury followed the instructions given in arriving at its verdict, and unless it affirmatively appears to the contrary, it cannot be said that such instructions were disregarded. *State v. Lenhart, supra*.

A trial court is vested with considerable discretion in passing on motions for mistrial and for a new trial, and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion. *Id*. An

appellate court's deference to the trial court stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial. *Id*. The trial judge has a special perspective on the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record. See *id*.

Here, Megan referenced witnessing an alleged drug deal made by Williams on direct questioning by the State:

> [State]: All right. So tell me what happens as you're sitting there in the parking lot of the Burger King.
>
> [Megan]: He's – either I saw him or he saw me, and he had made some type of drug deal.

Williams objected to this testimony and moved for a mistrial. The record reflects that the district court promptly sustained Williams' objection and instructed the jury to disregard the statement, thereby eliminating any risk of prejudice. Accordingly, as discussed above, it is presumed that the jury obeyed the court's instruction to disregard the statement, thereby eliminating any risk of prejudice. It then becomes Williams' burden to direct us to something in the record that would indicate otherwise.

Williams has not met this burden. Williams does not reference anything in the record to rebut the presumption that the jury obeyed the district court's instruction. Instead, Williams merely argues that the district court's instructions to the jury to disregard Megan's statement "was woefully insufficient to preserve Williams' right to a fair trial." Brief for appellant at 18.

We find that the district court did not abuse its discretion in overruling Williams' motion for a mistrial.

SUFFICIENCY OF EVIDENCE

Williams assigns that the evidence presented at trial was insufficient and lacked the probative value to find Williams guilty of assault in the second degree. Specifically, Williams argues that Megan's and Maxey's testimony does not sufficiently support the finding that Williams was the individual who hit Maxey in the head with a hatchet.

Williams was charged with second degree assault, in violation of Neb. Rev. Stat. § 28-309 (Reissue 2016). Section 28-309 states, in relevant part: "A person commits the offense of assault in the second degree if he or she . . . [i]ntentionally or knowingly causes bodily injury to another person with a dangerous instrument". See § 28-309(1)(a).

Both Megan and Maxey testified to their eyewitness accounts of Williams hitting Maxey in the head with a hatchet. Maxey's treating physician testified that Maxey suffered a fractured skull. The nature of the wound indicated Maxey had been hit by a sharp object with significant force.

Williams asserts that because both Megan and Maxey testified that the incident surprised them both and occurred in a matter of seconds, their identification of Williams as the assailant is insufficient. The jury clearly made an implicit credibility finding when it found Williams guilty of second degree assault. In reviewing a conviction for sufficiency of the evidence, we do not pass

on the credibility of witnesses and instead we recognize that it is a matter for the fact finder. See *State v. Lewis, supra*.

Williams also asserts that no evidence other than Megan's and Maxey's accounts connects him to the scene. He notes that there were no other reports from eyewitnesses, video evidence, DNA evidence, cell phone data, or any other evidence tying Williams to the scene. Although no evidence beyond the testimony of Megan and Maxey places Williams at the scene, the jury clearly found them sufficiently credible to conclude that Williams had committed an assault on Maxey. Additionally, though Gonzalez' testimony did not affirmatively identify Williams, his testimony that an individual near the apartment complex at the time of the assault was wearing a black puffer jacket is consistent with Megan's identification of Williams as the assailant. Again, the jury clearly made an implicit credibility finding and we decline to disturb this finding on appeal.

Viewing the evidence in this case in the light most favorable to the prosecution, we conclude that the jury could have found the elements of second degree assault had been proved beyond a reasonable doubt.

EXCESSIVE SENTENCE

Lastly, Williams assigns that the district court abused its discretion when it imposed an excessive sentence.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed. *State v. Sutton, supra*. In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Williams was sentenced to 16 to 20 years' imprisonment for second degree assault, a Class IIA felony. A Class IIA felony is punishable by a maximum of 20 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024). Thus, Williams' sentence is within the statutory limits.

Nevertheless, Williams argues that the district court failed to give adequate weight to mitigating factors such as Williams' substance abuse issues, his mental health concerns, and his physical health condition of Type 1 diabetes.

The PSR shows that Williams was 34 years old at the time the report was prepared, was married (with a pending divorce) with no dependents, and had a ninth-grade education. Williams' juvenile record is lengthy and includes many charged offenses in Massachusetts: however, the dispositions of those charges are not found in the record. Williams' adult criminal record also includes numerous charged offenses in Massachusetts, but again most of the dispositions of those charges are not contained in the record. In Nebraska, Williams has been convicted of assault and battery; disturbing the peace (twice); "cruelty towards child/commit abuse intent"; criminal mischief; destruction of property; disorderly conduct; violation of protection orders (four times);

second degree assault; and strangulation. Convictions subsequent to the charge at issue in this case include strangulation and terroristic threats. Williams has also subsequently been charged with tampering with a witness and several protection order violations. Williams' offenses in Nebraska primarily relate to interactions with Megan and Maxey. On the Level of Service/Case Management Inventory, Williams scored in the overall very high risk to reoffend category. Williams was also assessed on the Domestic Violence Offender Matrix, where he scored as a high risk candidate for community-based interventions.

The PSR reflects that Williams denied any issues with drugs or alcohol. Williams reported that he has been diagnosed with anxiety and is prescribed an anti-anxiety medication. Williams was diagnosed with Type 1 diabetes at age 7 and takes insulin daily.

At sentencing, the district court indicated that it considered the relevant statutory factors and reviewed the PSR, which contained the mitigating factors argued by Williams. The district court specifically noted Williams' Level of Service/Case Management Inventory score, diabetes, support by family and friends, and issues while confined in jail, including failing to comply, disruptions, verbal abuse, contraband possessions, assaulting staff, and fighting. Williams had also been on suicide watch with razor restrictions on three occasions. The district court observed that the probation office recommended a straight sentence of imprisonment, as anything less would depreciate the seriousness of the offense and promote societal disrespect for the law.

We find no abuse of discretion by the district court in the sentence imposed.

CONCLUSION

For the reasons stated herein, we affirm the conviction and sentence imposed by the district court.

AFFIRMED.